## WALKER v. UNITED STATES.*

### DRUMMOND v. SAME.

### Nos. 10863, 10864.

Circuit Court of Appeals, Eighth Circuit.

Nov. 29, 1937.

Rehearing Denied Dec. 17, 1937.

*Writ of certiorari denied 58 S.Ct. 642, 82 L.Ed. ——.

William G. Boatright and Harry L. Jacobs, both of Kansas City, Mo. (I. J. Ringolsky, Ludwick Graves, James Daleo, Ringolsky, Boatright & Jacobs, and Johnson, Lucas, Landon, Graves & Fane, all of Kansas City, Mo., on the brief), for appellants.

Maurice M. Milligan, U. S. Atty., and Thomas A. Costolow, Asst. U. S. Atty., both of Kansas City, Mo. (Sam. C. Blair, Randall Wilson, and Richard K. Phelps, Asst. U. S. Attys., all of Kansas City, Mo., on the brief), for appellee.

Before GARDNER, SANBORN, and THOMAS, Circuit Judges.

GARDNER, Circuit Judge.

Appellants, with five others, were indicted in an indictment containing two counts. The first count charges a conspiracy in violation of section 19 of the Criminal Code (title 18, § 51, U.S.C.A.), to injure and oppress citizens in their right to vote for presidential electors and to have their votes counted as cast, while the second count charges a similar conspiracy to injure and oppress citizens in their right to vote for members of Congress and to have their votes counted as cast. The indictment, omitting mere formal allegations, charges in substance that "a number of persons who were citizens of the United States of America and residents of the State of Missouri, a part of whom are to the Grand Jurors unknown and whose names and exact description therefore cannot be set forth in this Indictment, and the remaining ones of whom, although known to the Grand Jurors, are too numerous to be named and described in this Indictment, and all of whom are hereinafter referred to as voters, then and there were residents of the 13th Precinct of the 12th Ward located in Kansas City, Jackson County, Missouri, and of the 4th Congressional District of the State of Missouri, and then and there were legally qualified voters who had duly and legally qualified to vote in accordance with the requirements of the laws of the State of Missouri relating to the qualifications of voters, and

had duly and legally registered in accordance with such laws as such voters in the Precinct and Ward aforesaid, and then and there possessed and had the necessary and requisite qualifications to entitle them to vote at the General and Presidential Election hereinafter described, and then and there possessed and had the rights and privileges which were guaranteed and secured to them and to each of them by the Constitution and laws of the United States of America, all because of their citizenship and residence aforesaid, and their qualifications and registration as aforesaid, and complete and full compliance with the laws of the State of Missouri as aforesaid, and then and there were entitled to exercise and to enjoy the same, which rights and privileges embraced and included, among others, the right and privilege to exercise the right of suffrage and to vote in and for the election of a legally qualified person to the office of Representative in the Congress of the United States of America to represent the people of the 4th Congressional District of the State of Missouri, and of the United States of America, at the General election to be held on the 3rd day of November, 1936, for such purpose, in the Congressional District aforesaid, and the right and privilege to have their votes and each of them for the person aforesaid accurately, honestly and truthfully counted, recorded, certified and returned as cast;" that at the election so held, the defendant Edson M. Walker, with certain other named defendants, were judges of election, duly qualified and acting as such; that certain other named defendants were the clerks of the election, duly qualified and acting as such; and the defendant John H. Drummond was a precinct captain, chosen and acting as such; that at the election so held the defendants conspired to injure and oppress the said voters described in the indictment in the free exercise of the rights and privileges guaranteed and secured to them by the Constitution and laws of the United States of America, namely, the right and privilege to exercise the right of suffrage to vote at and for the election of a legally qualified person to the office of Representative to the Congress of the United States of America, and to have their votes so cast accurately, honestly, and truthfully counted, recorded, certified, and returned. This conspiracy in effect was that after the voters had marked and cast their ballots and deposited them in the ballot box, the defendants would count, record, and certify and cause the judges and clerks of said election to count, record, and certify to the board of election commissioners of Kansas City, Mo., the votes of such voters as having been actually and in fact cast for the persons who were candidates opposing the persons for whom the votes were actually cast, so that the voters and each of them would be injured and oppressed in the free exercise and enjoyment of their rights and privileges as voters and so that the votes of such voters as were cast for candidates of the Republican Party for the office of Representative to the Congress of the United States of America would be given to other persons opposing such candidates. Various overt acts are charged.

Appellants filed demurrers to the indictment. They also filed pleas in abatement based upon the alleged prejudicial character of the charge given to the grand jury by the trial judge. They also filed motions to quash the petit jury panel, assailing the propriety of the method of selecting the names of the persons for jury service. The demurrers, pleas in abatement, and motions to quash were all overruled. The case was submitted to the jury on the second count only. Two of the defendants, appellants here, were found guilty. The jury disagreed as to three other defendants, while two defendants, Chloe G. Albright and Tessie Mears, entered pleas of nolo contendere, and at the conclusion of the trial they were placed on probation for one year without sentence.

Appellants, on the verdict of guilty, were each sentenced to serve two years in the United States prison. They seek reversal upon various grounds which may be summarized substantially as follows: (1) The indictment does not charge a federal offense; (2) the charges to the grand jury were improper; (3) the petit jurors were improperly selected; (4) there was an improper exclusion of residents of Kansas City and Jackson county from the petit jury panel; (5) the evidence was insufficient to sustain the verdict of guilty; (6) it was error to admit testimony of grand jurors on the trial of the action; (7) evidence of stuffing the ballot box and repeat voting was improperly admitted; (8) evidence concerning unidentified men was improperly admitted; (9) evidence that appellant Walker refused to make statement was inadmissible; (10) the charge to the jury was erroneous, argumentative, and misleading; (11) it was error to refuse to set the order

of cases for trial when requested by defendants' counsel; and (12) it was error to receive nolo contendere pleas in the presence of the jury.

As a matter of convenience, the parties will be referred to as they appeared below.

With this case there were submitted four other similar cases, and by agreement of counsel the questions common to all the cases were argued in this case, and they will be here considered. While only the second count of the indictment in this case was submitted to the jury, in some of the other cases both counts were submitted, and in discussing the question of the sufficiency of the indictment, we shall consider both counts.

■ 1. Section 51, title 18 U.S.C.A. (section 19, Criminal Code), provides that "if two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same," they shall be fined and imprisoned as in the statute provided. In assailing the indictment, defendants urge that the right which is protected by this statute is a personal and individual one, while the conspiracy charged is one affecting the public right in the result of all of the votes, and hence no federal offense is described in the indictment. The gist of the crime is the unlawful conspiracy. Smith v. United States (C.C.A.8) 157 F. 721; Steedle v. United States (C.C.A.3) 85 F.2d 867, 107 A.L.R. 1361; Aczel v. United States (C.C.A.7) 232 F. 652.

The unlawful conspiracy alleged, briefly stated, was to injure qualified voters in their rights to have their votes for presidential electors (count 1) and representatives in Congress (count 2) counted, by falsely counting, recording, certifying, and returning them. Counsel for defendants argue that under this statute, when the voter has cast his ballot, his personal interest ceases and merges in the general public interest in an honest record and count of the votes cast, and for that reason a conspiracy to count, record, and return ballots falsely does not constitute a crime. The argument, we think, has already been met by controlling decisions. United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355; United States v. Pleva (C.C.A.2) 66 F.2d 529, 530; Diulius v. United States (C.C.A.3) 79 F.2d 371; Connelly v. United States (C.C.A.3) 79 F.2d 373.

In United States v. Mosley, supra, defendants, who were county election officials, agreed that they would omit from their count the precinct returns in an election in which a member of Congress was to be elected. The District Court sustained a demurrer to the indictment, but on appeal its order was reversed by the Supreme Court. In United States v. Pleva, supra, the conspiracy alleged was to falsify a record of votes cast for federal officers. In holding the indictment good, the court said:

"In view of the decision in the Mosley Case, supra, it seems unnecessary to do more than point out that this indictment charges the conspiracy as one to injure and oppress voters, not candidates for office, and that it is self-evident that a legal voter is injured unless he is not only permitted to vote, but to have his vote counted as cast."

■ Defendants strongly rely upon United States v. Bathgate, 246 U.S. 220, 38 S.Ct. 269, 62 L.Ed. 676; Chavez v. United States (C.C.A.8) 261 F. 174, 175; United States v. Kantor (C.C.A.2) 78 F.2d 710; and Steedle v. United States (C.C.A.3) 85 F.2d 867, 107 A.L.R. 1361, but the cases are readily distinguishable. United States v. Bathgate was a bribery case. Chavez v. United States was a case where the indictment charged a conspiracy against the right of the candidates and all of the voters in the state at large. In that case, United States v. Mosley was distinguished because the Mosley Case "held the protection of the statute embraced the personal right of a voter to have his ballot counted and returned as he cast it. That is an essential part of the right to vote." In United States v. Kantor it was held that there was no injury to qualified voters by inclusion of disqualified voters. In Steedle v. United States the conspiracy proved was a plan to change votes for candidates for the state Legislature, and on that point the case turned. In the instant case, however, a conspiracy to injure the voters in their personal right is specifically charged, and we cannot agree with counsel for defendants that the indictment charges only an agreement to injure the people or the voters in their public right and interest. Neither are such cases as Buchanan v. United States (C.C.A.8) 233 F. 257, Janes v. United States (C.C.A.8) 6 F.2d 545, and McDonald v. United States (C.C.A.8) 9 F.2d 506, in point. In these cases there was involved a question of fact as to whether the defendants intended to injure citizens in their federal right. But here there are direct allegations

in the indictment that the defendants conspired to count, record, and certify the ballots of voters falsely with fraudulent intent. While a conspiracy to count and return falsely would doubtless result in an injury to the public, it still has the direct object and effect of injuring the individuals whose ballots are denied their intended effect, and it is this injury with which the indictment deals in explicit charges.

We put aside the argument that section 51, supra, was not intended to cover the case made by the indictment, because of the repeal of the Act of May 31, 1870, c. 114. That question was settled adversely to the contention of counsel by United States v. Mosley, supra.

In certain of the companion cases there were convictions under count 1 charging a conspiracy to injure and oppress citizens in their right to vote for presidential electors. It is contended by defendants that presidential electors are officers of the state and not federal officers. We are of the view that this contention is sound and should be sustained. Article 2, section 1, United States Constitution; section 10730, Revised Statutes Missouri 1929 (Mo.St. Ann. § 10730, p. 3946); Fitzgerald v. Green, 134 U.S. 377, 10 S.Ct. 586, 587, 33 L.Ed. 951; Burroughs v. United States, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484; 12th Amendment, United States Constitution.

In Fitzgerald v. Green, supra, the court said:

"The sole function of the presidential electors is to cast, certify, and transmit the vote of the state for president and vice-president of the nation. Although the electors are appointed and act under and pursuant to the constitution of the United States, they are no more officers or agents of the United States than are the members of the state legislatures when acting as electors of federal senators, or the people of the states when acting as electors of representatives in congress."

Congress has enacted legislation which supplements the Twelfth Amendment and provides when the electors shall meet, that the Chief Executive shall certify to the Secretary of State the ascertainment of the electors "by the final ascertainment, under and in pursuance of the laws of such State providing for such ascertainment." The method of returning the vote of their state is also covered. Title 3 U.S.C., §§ 5a to 11c, inclusive, 3 U.S.C.A. §§ 5a to 11c, Act of May 29, 1928, 45 Stat. 945, and amendments of June 5, 1934, c. 390, 48 Stat. 879. This legislation recognizes that the mode of selection of electors from a particular state is a matter of local law.

The question is not one of the power of Congress to safeguard the elections of presidential electors, but rather whether it has done so by section 51, title 18 U.S.C.A.

The Federal Constitution does not provide that the selection of electors shall be by popular vote, nor that the electors shall be voted for upon a general ticket, nor that the majority of those who exercise the elective franchise can alone choose the electors. It leaves it to the state Legislature to define the method of effecting the object. McPherson v. Blacker, 146 U.S. 1, 10, 13 S.Ct. 3, 10, 36 L.Ed. 869. As said by Mr. Chief Justice Fuller in McPherson v. Blacker, supra, "the appointment and mode of appointment of electors belong exclusively to the states under the constitution of the United States."

Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 158, 28 L.Ed. 274, relied upon by the government, does not support the contrary conclusion. That case involved the election of a member of Congress. The Constitution, as the opinion points out, created the office and provided for election of its members by electors in each state having the same qualifications requisite for electors of the most numerous branch of the state Legislature. The court there said:

"The states, in prescribing the qualifications of voters for the most numerous branch of their own legislatures, do not do this with reference to the election for members of congress. Nor can they prescribe the qualification for voters for those eo nomine. They define who are to vote for the popular branch of their own legislature, and the constitution of the United States says the same persons shall vote for members of congress in that state. It adopts the qualification thus furnished as the qualification of its own electors for members of congress.

"It is not true, therefore, that electors for members of congress owe their right to vote to the state law, in any sense which makes the exercise of the right to depend exclusively on the law of the state."

But we are here discussing the status of presidential electors. Manifestly, the right to vote for presidential electors depends directly and exclusively on state legislation.

We conclude that count 1 of the various indictments does not state a federal offense.

2. Defendants contend that their pleas in abatement should have been sustained because of the charge of Judge Reeves to the grand jury. It may first be observed that pleas in abatement are not favored in law, and they are to be strictly construed. Only part of the judge's charge is preserved in the record, and it was not contended in the lower court, nor is it contended here that the indictment was returned without proper or sufficient evidence to sustain it. Nor is there any proof, direct or circumstantial, tending to show that any defendant was indicted who would not have been indicted but for the charge. The trial judge twice charged the grand jury because a change had taken place in the personnel of the grand jury. In the first charge the judge stated that he had been informed of various offenses against the ballot box, and admonished the jurors that if such a case came before them, the persons who committed the offense would be guilty. By way of illustration, he mentioned a hypothetical case where eighty votes might be cast and only four or five votes certified from the precinct. Of this, he said of those responsible, "It makes no difference who they are, they are law violators and are not willing to abide by the will of the majority. They are cheating and defrauding the American people of their rights." Interference with the inquiry, he said, would be an act of treason. He said that the fair name of Kansas City should be cleared of charges of illegal election practices if they were untrue, and, if true, the individuals responsible for the odium upon the name of the city should be punished until no longer would such things occur; that there was crying need for the purification of the ballot in America; that the ballots and voting could not be left to the men who go through the streets of the city with machine guns and without license plates on their automobiles, intimidating, striking, and bludgeoning the honest citizens who are trying to cast their honest votes; that the government must look into those cases; that a short time ago, kidnappings were all too common; that men were kidnapped and taken across the state line, and the government got after those persons and tracked them down until the men who were guilty are either in their graves or in Alcatraz; that the government stopped that crime, and the government will move upon corrupt voting. "A corrupt vote may be lik-

ened to a loaded and cocked gun pointing at the very heart of America. If we would preserve America, we must preserve the purity of the ballot box, and we must do that even if our prisons and our jails must be crowded to suffocation with those who would destroy a pure ballot. Those that would destroy the ballot are those that would destroy the Government. * * * It is almost a matter of common knowledge that at the ballot box, the individual who would corrupt the ballot is omnipresent, where non-citizens are used, and where many men vote many times." He also said, "I can't emphasize too strongly the grave responsibility that rests upon you men and the importance of an inquiry, and when you begin your war upon this corruption in Kansas City and elsewhere, you will have every good citizen behind you. * * * Gentlemen, it is a great responsibility that you have and you will move against the crimes against the Government and crimes against the ballot box. I put equal emphasis upon it with other crimes. Every one of them ought to be prosecuted and punished. There is already upon the pillars of a free Government a strain today because of the chaos of the world. If it be true in the individuals who like worms in the nighttime and in the dark places are working, and boring into the pillars of the fabric of our government and digging into the heart of it, then in a little while, the crash will come."

In the second charge, the judge said, among other things, "In this inquiry I warn you that those who violate election laws constitute a most dangerous foe, whether they be in Kansas City or elsewhere, or whether they be of one political party or another political party, they constitute a most dangerous foe. * * * The ballot box offender is a dangerous offender, and being a dangerous offender, resorts to the methods employed by other criminals who interfere with investigations by the Grand Jury. I warn you men that ordinary criminals do not appoach bluntly and abruptly in order to stop any inquiries concerning their conduct, but they work by indirection."

The judge recited in detail the incident of Napoleon and his drummer boy at the battle of Marengo, and concluded, "Gentlemen, I sound the charge to you today. I give the blast of the trumpet that I hope will never call a retreat." He referred to Benedict Arnold, as the man who listened to the voice of those who said, "It can't be done; it can't be done," and the judge said,

"Gentlemen, the call is to you. As you proceed you should bear in mind that 'It can be done.'"

He pointed out, however, that charges were not to be preferred because of spite or malice, and that they should be reasonably satisfied upon the testimony that the accused ought to be put upon trial.

The pleas in abatement allege that the charges to the grand jury were intemperate, inflammatory, argumentative, prejudicial, and impassioned, and designed and calculated to inflame and excite the passion and prejudice of the grand jury against the defendants.

■ As has already been observed, it was not contended that the indictments were returned on insufficient evidence, and there is no showing of prejudice. Independence of the grand jurors must, of course, be preserved. The judge did not mention any of these defendants, and his remarks were against the crime by whomever committed. "It is the province of the circuit judge and his duty to inveigh against crime of all kinds and in every quarter, but it is a usurpation of power to denounce individuals, or to specifically direct the attention of the grand jury to any named person." Fuller v. State, 85 Miss. 199, 37 So. 749, 750. The charge of the trial judge is a scathing condemnation, oratorically expressed to be sure, of various kinds of election crimes and frauds. Some of the expressions complained of were intemperate and are not to be commended as models in explaining to grand jurors the nature of their duties. It lays emphasis on the duty of the grand jury, but at the same time it does not go so far as to urge that any individual, guilty or innocent, named or unnamed, be accused by indictment. We do not think prejudice has been shown, and the court did not err in overruling the pleas in abatement.

3. It is next contended that the petit jury was not properly selected. The clerk of the lower court obtained names from which the petit jurors were selected, by use of the following form letter:

"Kansas City, Mo. ——— 193——

"Dear Sir: As officers of the United States District Court for the Western District of Missouri, it is our duty to select the names of suitable persons as Grand and Petit Jurors for the United States District Court. As we must, more or less, rely upon the assistance of some proper person in given localities for information as to the fitness of jurors we beg that you will be so kind as to render this service in your county. We would be pleased if you would furnish, at the earliest date possible, the names of a number of citizens of your acquaintance, together with their occupation and P. O. address. We beg and impress upon you the fact that it is the desire of the Judge of this district to obtain for jury service, the best men in the community, men of intelligence, unquestioned integrity, and who represent the best interests of the community. We do not want men for this service simply because they have nothing else to do, and who would like to spend the time and procure the pay for coming to court. We want men of business affairs. * * *

"Yours very truly,

"———————

"Clerk.

"———————

"Jury Commissioner."

This form of letter had been in use for at least twenty years. There are two or three thousand names in the jury box. The form letter is sent out by the jury commissioner and the clerk of the District Court to persons throughout the district who are considered reliable. It is sent out when the jury box begins to run low, possibly once a year. This is not the only method of securing names. Some names are suggested by persons without use of the letter. The clerk testified that in drawing names from the box for jurors, there were persons of all occupations and businesses included, among them wage-earners and laborers. After names were received in reply to the letters, they were typed on pieces of paper which were placed in the box.

Did the method of obtaining names depart from legal requirements?

Section 275 of the Judicial Code (section 411, title 28 U.S.C.A.) provides:

"Jurors to serve in the courts of the United States, in each State respectively, shall have the same qualifications, subject to the provisions hereinafter contained, and be entitled to the same exemptions, as jurors of the highest court of law in such State may have and be entitled to at the time when such jurors for service in the courts of the United States are summoned."

Section 276 of the Judicial Code (section 412, title 28 U.S.C.A.) provides for the method of drawing jurors, and section 8746, Revised Statutes of Missouri 1929 (Mo.St. Ann. § 8746, p. 4691), provides for the qual-

ifications of jurors in the state court as follows:

"Every juror, grand and petit, shall be a male citizen of the state, resident of the county, sober and intelligent, of good reputation, over twenty-one years of age and otherwise qualified."

■ It is urged first that the letter constitutes an unlawful delegation of the duties imposed ·by statute on the clerk and jury commissioner to ·select names. The method of selection employed was not a delegation, but a discharge of duty. The clerk and jury commissioner did not authorize nor empower any one to act for them, and we apprehend the law does not contemplate that they must acquire personal knowledge of or acquaintance with prospective jurors so that they may act on their personal knowledge. The manner of acquiring information is for them to determine. The names were submitted as responses to requests for information, and if all the names submitted were chosen that would still constitute a choice by the officers as much as if any lesser number were selected. A small percentage of the total was selected in another manner. These officers, having discharged their duties in a manner not tainted by any suggestion of evil purpose or fraud, are not subject to criticism. United States v. McClure (D.C.) 4 F.Supp. 668.

■ Secondly, it is urged that the letter sets up a standard of qualifications not authorized by law, · thus excluding citizens otherwise qualified, particularly members of the wage-earning class and unemployed persons, and all persons not "men of business affairs." This letter was manifestly not intended to be an arbitrary exclusion of unemployed persons, ·but discriminates between prospective jurors who "have nothing else to do, and would like to spend the time and procure ·the pay for coming to court," and others, whether employed or unemployed. The question then narrows itself to the sentence, "We want men of business affairs." Was that such an exclusion of those who were laborers or wage-earners as to show a systematic scheme to exclude persons who were competent to act as jurors? The words are "men of business affairs," not "business men," and the expressions are not synonymous. Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L. Ed. 1074. Business embraces everything about which a person can be employed and that which occupies the time, attention, and

labor of man for the purpose of livelihood or profit. Black's Law Dictionary, p. 260; Bouvier's Law Dictionary, p. 406; Flint v. Stone-Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312. The word "affairs" is an inclusive term bringing within its scope and meaning anything that a person may do. 2 C.J.S., Affair, p. 917.

We conclude that no violation of any statute or rule applying to the selection of jurors is shown to have occurred, and no prejudice has been shown by reason of the method employed.

4. It is urged that the court erred in making its order relative to the selection of the petit jury panel, directing the clerk and the jury commissioner to draw the names of seventy persons qualified for jury service who were residents and citizens of the Western District of Missouri, because the order directed that the· jurors should be drawn from the several divisions of the district, exclusive of Jackson county, in which Kansas City is located. In entering this order the court stated that it was of the opinion that by reason of the great publicity in Kansas City and Jackson county and discussion therein, it would be extremely difficult to obtain from Kansas City and Jackson county impartial jurors; that without causing to be summoned a very large panel of jurors and incurring large and unnecessary expense, an impartial jury could not be obtained; and that it was therefore of the opinion that for the sake of obtaining an impartial trial, both for the plaintiff and the defendants in the cases named, it was desirable that jurors should not be called from Jackson county. The secondary ·reason which the court stated, to wit, that almost without exception the defendants in these cases were residents of Kansas City and Jackson county, and all of the offenses were charged to have been committed in Kansas City and Jackson county, would probably not justify the order alone.

In the motions to quash the petit jury panel, it is charged that the order was invalid and unconstitutional, and in violation of the Sixth Amendment to the Constitution; that the judge made the order without evidence; that it was made without giving defendants the right to be heard thereon, or to present evidence as to the facts or grounds recited therein.

Section 277 of the Judicial Code, title 28 U.S.C.A. § 413, provides that jurors shall

be returned from such parts of the district, from time to time, as the court shall direct so as to be most favorable to an impartial trial and so as not to incur any unnecessary expense, or unduly burden the citizens of any part of the district with such service.

 We think the contention is entirely without merit. This court has held that the exclusion of a certain part of a district is proper and that the court need not give any reason, and certainly there is a presumption that it has exercised a sound discretion in making the order, and the burden is on the party who seeks to challenge it as arbitrary. Myers v. United States (C.C.A. 8) 15 F.2d 977; Spencer v. United States (C.C.A.8) 169 F. 562; Jarl v. United States (C.C.A.8) 19 F.2d 891; Ruthenberg v. United States, 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414.

 5. Is there substantial evidence to sustain the verdict? The jury having found the defendants guilty, that view of the evidence and the inferences reasonably deducible therefrom which is most favorable to the government must be accepted. Galatas v. United States (C.C.A.8) 80 F.2d 15; Marx v. United States (C.C.A.8) 86 F.2d 245; Sloan v. United States (C.C.A.8) 287 F. 91. If, as so viewed, there is substantial evidence, then there was no error in denying defendants' motion for a directed verdict. The argument of defendants on this question is directed largely to the question as to the nature of the conspiracy and the purpose and intent of the defendants with reference thereto, rather than to the existence of such a conspiracy. It is urged that the evidence showed that the conspiracy was directed to the injury or defeat of a candidate for Congress, rather than an injury to the individual qualified voter, or that it was directed to a right in which the public rather than the individual had an interest. These questions have already been discussed in connection with the challenge to the indictment, and direct, as well as circumstantial evidence, tended strongly to sustain the specific allegations of the indictment in this regard. No extended discussion of the evidence should be required to demonstrate that Walker and Drummond were actively and knowingly participating in an unlawful conspiracy. Galatas v. United States (C.C.A.8) 80 F.2d 15; Marx v. United States (C.C.A.8) 86 F.2d 245; Addyston Pipe & Steel So. Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 108, 44 L.Ed. 136.

In the last-cited case it is said:

"It is useless for the defendants to say they did not intend to regulate or affect interstate commerce. They intended to make the very combination and agreement which they in fact did make, and they must be held to have intended (if in such case intention is of the least importance) the necessary and direct result of their agreement."

 A brief reference to portions of the testimony will dispel all doubt as to the existence of a conspiracy not honestly to count the ballots as cast and to make false returns thereof.

At the precinct involved in this case, the judges and clerks of election were as follows: Edson Walker, Democratic judge; Loretta McEntee, Democratic judge; Chloe Albright, Republican judge; Elijah Burke, Republican judge; Anna V. O'Laughlin, Democratic clerk; Tessie Mears, Republican clerk; and John H. Drummond, a Democratic precinct captain, who was acting as a challenger and had a right to be present at the polling place, but had no duty in respect to the conduct of the election, and hence was not an election official.

Agnes Aulgur was a Republican judge during most of the day, but was displaced by reason of a temporary absence by Elijah Burke. Agnes Aulgur served until 5:30 in the afternoon, and kept what is referred to as the original register of voters. When voters came to the polling place and gave their names, she examined the register to ascertain if they were registered voters, and, if so, she made a check opposite the name, indicating that the voter had cast his ballot. After lunch she had a conversation with defendant Drummond, in which he indicated that the ballots were not to be counted. She replied that the ballots would be counted, and he later inquired whether she was going to stick to her position, insisting on counting the ballots. Being advised that she was, Drummond said, "Well, you know what that means," to which she replied in the negative. Mrs. Aulgur, as a result of this controversy, called the election commissioners, or one of them, and complained that she was going to be put out of the polling place because she was going to count the ballots.

During the time that Mrs. Aulgur was acting, three men came into the polling place and told her that she should leave the place. This was in the presence of the defendants,

and she said this demand was "yelled" at her. One of these men followed her around for a while, and when she started checking the register again, he came up to her and told her that she was getting out of there. She left the polling place on account of the fear caused by what was said by one of these unidentified men in the presence and hearing of the defendants. She again called the election commissioners, and two of them went back to the polling place with her; but when she arrived there was a lot of argument between defendant Drummond and the commissioner. In her absence another judge had been put in her place. During the time that she was acting as an election jduge, Drummond, although having no duty with reference thereto, laid the books down on the table and said something about signing them, and he said, "We'll just sign them now and get the job over with."

Another witness, Chloe Albright, testified that at one time when the ballot box was open for the ballots to be pushed down, she saw Drummond put a handful of ballots in the box, "seemingly from his pocket." She observed one of the men who had threatened Mrs. Aulgur vote repeatedly, as much as two or three times at that voting place, and she heard the threat to Mrs. Aulgur. One of them, in an abrupt voice, said to Mrs. Aulgur, "Well, make up your mind." Drummond, with these men, met Mrs. Aulgur in the stairway, and one of them said, "We are going to take you with us," to which she replied, "Oh, no you are not." One of the men said to Mrs. Aulgur in this connection, "I would just as leave hit you as hit a man," and added, "Well, if you will go on home we will leave you alone."

When Mrs. Aulgur returned with the commissioner, Drummond said she had been out more than fifteen minutes and could not be put back, and he got out the election books and read the provision allowing a substitute for any official who absented himself more than fifteen minutes from the polling place. Mrs. Aulgur protested that she had been forced to leave, but the substitution was permitted to stand.

Defendant Walker told Mrs. Albright that they were not going to count the votes, and when she inquired of him what he would do if she forced the count of the votes, he replied, "We'll do you like Mrs. Aulgur, or worse, or will take you for a one-way ride." Later he said to her, "Now, you girls do as we say and there won't be any trouble, and

instead of you getting your Six Dollars, your regular pay, I will see that you get Ten Dollars, or more." About 6 o'clock and before the polls were closed, Walker brought out the poll books to Mrs. Albright, laid them down on the table and said, "We are going to sign these books now." Mrs. Albright protested, to which he replied, "That is all right. We will sign them now and get it over with." He also said, "Are you going to sign them now?" When she answered in the negative, he said, "I will give you fifteen minutes to sign them in."

Walker and Drummond opened the ballot box and placed it on the table, and after the ballots were taken out and separated, Walker said, "Mrs. Albright and I will take these ballots over and count them." He then carried them over, but said to Mrs. Albright, "We are not going to count the ballots. It takes too much time." Mrs. Albright protested that the ballots were to be counted and said, "How are you going to tell how many votes the Republicans get and how many the Democrats get?" to which Walker answered, "We can make that up. We have got a list of that." Mrs. Albright inquired, "Just what count are you going to give the Republicans and Democrats?" Walker answered, "Oh, we have got a count here, probably 601 to the Democrats and around 60 to the Republicans." He then read off figures which were marked down on the tally sheets and the ballots were placed in the sack without being counted. The votes were falsely certified to the board of election commissioners, whose duty it was under the law to accept the official return without counting the ballots.

When the polls closed but 702 were registered as having voted. Each poll book contains a statement of votes cast for each candidate and is to be certified as correct. All Democratic candidates were shown to have received 686 votes and the Republican candidates 61, except the Republican candidate for Congress, who was shown not to have received any. The tally sheets were certified as a true and correct tally of all the votes cast for the various candidates. The correct count of ballots gives the Democratic candidate for Representative in Congress 572 votes, and the Republican 162.

It appeared from the evidence that commencing with line 703 of the register, to line 747, inclusive, all of the names purporting to be names of additional voters were either duplicates of the names of voters appearing opposite numbers previous to

number 702 in the poll books, or duplicates with some variation in spelling.

After the indictment was returned, defendant Walker called on Mrs. Mears and Mrs. Albright and suggested that they suppress statements as to what had occurred at the polling place.

When Mrs. Albright objected to the repeat voting by the men that had ordered Mrs. Aulgur out, the defendant Drummond stepped up to her and said, "If you can't run things right, we have people who can."

The foregoing excerpts from the testimony are simply illustrative of a great mass of testimony and circumstances which we think overwhelmingly establish the conspiracy alleged and the participation of these defendants therein. We conclude that there was no error in denying defendants' motion for a directed verdict.

6. Five members of the grand jury, called by the government, testified that as members of the grand jury they had opened the ballot sacks, counted the ballots, and had not changed any ballots nor tampered with the records. Their testimony was objected to on the ground that the use of their testimony would carry undue weight. The court, in its instructions to the jury, stated that the fact that these witnesses were members of the grand jury would not take from nor add anything to their testimony. The contention that defendants were prejudiced by this testimony is wholly without merit. They identified the ballots and testified as to how they tallied the ballots, and the court protected defendants against any possibility of prejudice.

7. In proof of what took place at this polling place and of the manner of conducting the election, the testimony showed a "stuffing of the ballot box," and there was evidence of repeat voting. It was all part of the transactions and admissible to show that the misconduct and miscertification were not the result of an innocent mistake. United States v. Pleva (C.C.A.2) 66 F.2d 529.

8. Evidence of the acts of the so-called unidentified men was also properly admitted. It explained certain acts of the defendants Drummond and Walker which would otherwise have been barren of meaning, and what these men said and did in the presence of these defendants, one of whom at least had a duty with reference to the proper conduct of the election, was admissible, and it appears that defendant Drum-

mond participated to a greater or less extent in the acts of these parties. Much discretion must of necessity be vested in the trial court with reference to the admissibility of evidence of circumstances when the charge is conspiracy, and its ruling will ordinarily be sustained if the testimony which is admitted tends in some degree to establish the ultimate fact or makes the evidence intelligible. Nee v. United States (C.C.A.3) 267 F. 84.

9. A special agent of the Bureau of Investigation testified that several of the defendants had made statements to him to the effect that all of the election paraphernalia was delivered to the board of election commissioners on election night. After he had so testified, counsel for the government asked him whether he had interviewed Walker "as to what he did on that night in regard to the same matter." He answered, "Yes;" that Mr. Walker refused to make a statement. Defendants moved to strike the answer as not responsive. The court said he thought it was responsive, but he said to the witness, "You mean by the word 'refused,' he did not make a statement?" The witness answered, "He did not make a statement." Counsel for defendants moved to strike out all of the testimony of this witness for the reasons heretofore given. It is now urged that this testimony may have given rise to an inference against Walker because of his silence or refusal to make a statement, but the objection did not go to that point and it was not called to the court's attention. Furthermore, the motion to strike included all the testimony of the witness and was not limited to this particular testimony. This being true, it was proper to deny the motion to strike. Marx v. United States (C.C.A.8) 86 F.2d 245.

10. It is urged that the charge of the court was argumentative, misleading and one-sided, but the portion of the instructions to which this argument is directed were not excepted to; hence, such objection cannot properly be urged here. Other exceptions taken to the instructions, in view of our conclusions as to the sufficiency of the indictment, are, we think, wholly without merit.

11. It is urged as error that the trial court refused to require the District Attorney to state which of three cases would first be moved for trial. When rulings on the demurrers and pleas in abatement were made in this and two other cases on Febru-

ary 10, 1937, counsel for defendants asked the court to require the District Attorney to announce which of the three cases would be first called for trial. The court declined to make such an order, and on February 13, 1937, counsel filed a formal motion to set the order of the cases for trial, and this motion was denied. On February 15, 1937, the government announced that this case would be first moved for trial. The indictment was returned January 9, 1937. No motion for continuance was made when this case was called for trial, and no showing was made that 'counsel were unprepared for trial. Defendants had more than a month to make preparation, and no abuse of discretion is shown by the refusal of the trial court to order the District Attorney to indicate which one of the three similar cases in which counsel for defendants appeared, would be first tried.

12. Following the impaneling of the jury and before the opening statements were made, the United States District Attorney announced that it had been brought to his attention by counsel representing defendant Mears and Albright that they desired to enter pleas of nolo contendere. Objection was made by counsel for defendants to this statement and to the reception of such pleas in the presence of the jury. These objections were overruled, and it is urged that this ruling was erroneous and prejudicial to the defendants. It appears that the defendants Mears and Albright took the stand as witnesses and testified fully as to their part in the transaction. It could therefore scarcely be said to be prejudicial error to have received their pleas of nolo contendere in the presence of the jury. Minker v. United States (C.C.A.3) 85 F.2d 425, relied upon by defendants, is distinguishable for that reason. In the Minker Case there were fifty-four defendants. All but the appellant withdrew pleas of not guilty and entered pleas of guilty or nolo contendere. Testimony was taken and sentence imposed in the presence of the jurors who finally sat as jurors on the case against appellant. There is no analogy between the situation presented by that case and that shown by the record in the instant case.

The record indicates that these defendants have throughout been represented by able counsel. They have been given a fair trial before a jury which found them guilty, and we find no prejudicial error in the conduct of the trial. The judgments appealed from are therefore affirmed.

*Writ of certiorari denied 58 S.Ct. 642, 82 L.Ed. ——.