## SHANNABARGER v. UNITED STATES, and seven other cases.
### Nos. 10906–10913.

Circuit Court of Appeals, Eighth Circuit. Nov. 25, 1938.

Clif Langsdale, of Kansas City, Mo. (Charles V. Garnett, of Kansas City, Mo., on the brief), for appellants.

Thomas A. Costolow, Asst. U. S. Atty., of Kansas City, Mo. (Maurice M. Milligan, U. S. Atty., and Randall Wilson, Sam C. Blair, and Richard K. Phelps, Asst. U. S. Attys., all of Kansas City, Mo., on the brief), for the United States.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

The eight appellants were indicted jointly in an indictment containing two counts. The case was submitted to the jury on the second count only, and all the appellants were convicted. They have taken separate appeals, which have been consolidated in this court and are presented on a single record with a single brief on behalf of all appellants.

The second count of the indictment charged a conspiracy in violation of Section 19 of the Criminal Code, Title 18, Sec. 51, U.S.C.A., to injure and oppress citizens of the 22d precinct of the 12th ward in Kansas City, Missouri, in their right to vote at the November, 1936, election for Representative in Congress and to have their votes counted as cast. The defendants James McNamara and Charles H. Kaiser were precinct captains for the Democratic party in the 22d precinct of the ward; Irene Brennan and E. D. Shannabarger were the Democratic election judges; Nancy Bodenhammer and Nancy Constable were the Republican judges; Everett Pippin was the Democratic clerk, and Bessie D. Adams the Republican clerk. Pippin and Adams were sentenced to jail for one month and fined $100 each; Shannabarger, Bodenhammer and Constable were sentenced to six months in jail and fined $200 each; Kaiser and McNamara were sentenced to the penitentiary for three years and fined $500 each, and Irene Brennan was sentenced to the Women's Reformatory at Alderson, W. Va., for two years and fined $500.

Count two of the indictment is identical in form, except for the names of the defendants and the circumstances alleged in the overt acts, with a similar count of the indictment in the case of Walker v. United States, 8 Cir., 93 F.2d 383. The first four specifications of error in this appeal raise the same questions presented and decided in the Walker Case, supra, and they are supported by the same arguments. The decision of all these questions in the Walker case is controlling here. Three additional grounds for reversal are urged and argued on this appeal: (1) The testimony of grand jurors was erroneously admitted; (2) the court erred in ruling that affidavits of bias and prejudice filed by defendants were insufficient; and (3) the evidence was insufficient to sustain the verdict of guilty.

That the admission of the testimony of grand jurors was not prejudicial was determined adversely to the contentions of the appellants in the Walker Case, supra, and will not be reconsidered here. The affidavits of bias and prejudice filed in this case are not substantially different from the affidavit filed in Ryan v. United States, 8 Cir., 99 F.2d 864, submitted and decided at this term. The affidavits in both cases were directed against the same judge and were based upon the same grounds. We held that the ruling was without error in that case and we shall abide by that decision here.

The question of the sufficiency of the evidence to sustain the verdicts of guilty was raised by motion for directed verdicts by all the appellants when the government rested. They were all overruled and Kaiser stood upon his motion. The other appellants introduced evidence in defense and renewed their motions at the conclusion of all the evidence. The motions were again overruled.

The indictment charged that the election officials in precinct 22 certified and returned that 485 votes were cast for the Democratic candidate for Congress and 37 for the Republican candidate; that in truth there were only 432 Democratic votes cast and that there were 90 Republican votes cast; and that there were 53 Republican votes counted for the Democratic candidate.

Under the Missouri system of voting, a number is written by the judges of election on the reverse side of the voter's ballot and this identifies the ballot. Forty voters were called, each of whom testified that he or she had voted a straight Republican ticket and had made no changes or erasures or alterations of any kind upon the ballot voted, except to place an "X" in the circle at the top of the Republican Party column. Their identified ballots bore an obvious erasure of the "X" in the circle at the top of the Republican Party column and the substitution of an "X" at the top of the Democratic Party column. The votes for the Republican candidate for Representative in Congress were thus changed to apparent votes for the Democratic candidate for the federal office. The total of votes cast was falsely certified to be a larger number than were actually cast. The certificate showed that each Democratic candidate received the same number of votes. Split ballots were not considered. The same vote was given for, and the same vote against each constitutional amendment.

An expert witness from the technical laboratory of the Federal Bureau of Investigation who qualified as an expert on questioned documents testified that he had examined all of the political ballots, the tally sheets and poll books used in the precinct and had treated the ballots to bring out finger prints. As a result of his examination of the ballots, he testified to the following:

(1) There were 73 political ballots upon which erasures and changes had been made so as to change the intention of the voters to vote a Republican ballot into an apparent intention to vote a Democratic ballot.

(2) These changes were made in various ways, sometimes by erasing the "X" in the circle at the top of the Republican Party column, and marking an "X" in the circle at the top of the Democratic Party column; sometimes by erasing the "X" in the circle at the top of the Republican Party column and marking "X's" in the squares before the names of the various candidates in the Democratic Party column; and by erasing "X's" which had been made by the voter in the squares in front of the names of the various candidates in the Republican Party column and placing "X's" in the squares in front of the names of the various candidates in the Democratic Party column.

(3) There were five split ballots in which the marks originally made by the voter had not been erased but which had been marked for the Democratic candidates upon the ballot by some one other than by the persons voting such ballots.

(4) Of the seventy-three ballots, upon which erasures had been made and which had been changed from Republican ballots to Democratic ballots, 29 were changed by one and the same person.

(5) The remaining 44 erased and changed ballots were not changed by the same person but were changed by at least three different persons.

(6) The ballots were not changed at the time the voter marked them nor immediately after that. The reason for the conclusion given by the witness was, that examined under the microscope and measured by accurate instruments, the indentation of the "X" made in the Democratic circle after the "X" in the Republican circle had been erased is shown upon other ballots voted before and after the voter marking the ballots in question had voted. The time of day at which the voter voted is shown in three ways: First, sometimes by his direct testimony as to the hour in which he voted; secondly, by the serial number upon the ballot, as under the Missouri statutes (Mo. St.Ann. § 10300, p. 3743), ballots are numbered consecutively and in a pad all attached together, the low serial number being on top; and, thirdly, by the voter's number in the poll book showing the relative hour of the voting as compared with other voters.

It was shown that a voter who had a high serial number on his ballot, whose poll book showed that he must have voted later in the afternoon, had an "X" made in the circle at the top of the Democratic Party column after the "X" in the circle at the top of the Republican Party column had been erased and that the indentations of the "X" made after the erasure of the voter's mark upon the ballot could be found exactly reproduced upon some ballot which had been voted and deposited in the ballot box early in the morning. Sometimes the indentations on the ballot were as far apart serially as 150 ballots, at other times, 40.

Another expert testified that one ballot, bearing Serial No. 235092, bore latent finger prints which, when subjected to expert treatment and analysis, showed that the

finger prints were those of defendant James McNamara. The finger prints on this ballot were made by the fingers of the left hand and were made around the area on the ballot where the circle was at the top of the Republican Party column and in which circle an "X" originally placed there by a voter had been erased. The witness testified that the finger prints of the left hand on the ballot were made with more than ordinary pressure.

No witness was produced by the government who testified that he saw the ballots being altered. There was no evidence of any written agreement nor of any conversations among the appellants reflecting any agreement, undertaking or confederation among them to falsify the ballots or the election returns. The government relied upon the circumstances in evidence to establish the conspiracy and the guilt of the defendants. The questions for determination, therefore, are whether the circumstances shown are sufficient to sustain the inference that the conspiracy charged in the indictment existed, and as to each of the appellants whether he or she was a party to it.

The voting place in the 22d precinct was a room ordinarily used as a garage in the basement of a residence. It was about eight and one-half feet wide and about thirty feet long. The rest of the basement was used for the furnace and other purposes, so that there was very little room in which one could move around in it. The poll room was furnished with two tables which when placed end to end extended about 15 feet in length and the room was adequately lighted with electric lights. The six defendant election officials, the two defendant Democratic precinct captains, McNamara and Kaiser, and Dennis Flynn, a police officer, were present in the poll room from the time the polls opened in the morning until after the count and certification of the returns in the evening. A Mrs. Kaiser also appears to have been in the room and to have "called in voters" during the day, and a Mrs. Nice was there when the ballots were being counted.

The voters cast three different ballots at the election, one called the political ballot for the candidates in the general election, including candidates for Congress; one for airport bonds, and one for certain constitutional amendments in the state of Missouri.

The election officials took an oath before beginning the performance of their duties, and each one was furnished a pamphlet of instructions containing pertinent parts of the Missouri election laws. With reference to the counting of the ballots the instructions read: "It shall be the duty of the clerks and judges of election to make a true count and correct return of all votes cast and the candidates voted upon. None but the judges shall handle the ballots. Count the bond ballots first, count the constitutional amendment ballots second * * *." Tally sheets were furnished for the use of the clerks on which they were instructed to tally at once the votes as called by the judges. No irregularities substantially affecting the issue were shown to have occurred during the day, such as stuffing the ballot box or withdrawing ballots from the box. The government contends that the political ballots were altered when the counting and "handling" of the ballots is shown to have been done, and when the false returns were made up and signed and certified by all of the election officials between the time the polls closed at seven o'clock in the evening and the time the records were taken away about an hour and a half or two hours later.

After the polls closed, the two tables, which had stood end to end during the day, were placed side by side near the west end or entrance to the room and the counting began. The bond ballots and the constitutional amendment ballots were comparatively small. They were placed on the tables and the testimony of those defendants who took the witness stand is to the effect that a count was made of them by election judges, Constable, Bodenhammer and Shannabarger, assisted a part of the time by Brennan.

The political ballots were on much larger sheets, approximately 2 to 2½ feet square. The ballot box in which they had been deposited was taken to the east end of the room and they were emptied out upon the floor and spread in two piles. The precinct captains McNamara and Kaiser, and election judge Brennan were handling them; the police officer Flynn was in that part of the room, and Mrs. Kaiser, wife of captain Kaiser, and Mrs. Nice were busied about these ballots, while Pippin and Adams, the clerks, stood around until the "handling" of the ballots was completed. The captains McNamara and Kaiser finally called out the total vote thereon, and the clerks marked that total and enough tally marks to correspond to the total upon the

tally sheets. No count by call of each vote and response and entry of a tally mark was made.

Appellants McNamara, Kaiser and Brennan who were shown to have "handled" the political ballots did not testify. Appellants Adams, Pippin, Constable, Bodenhammer and Shannabarger testified that they were present after the polls closed; that they did not count or assist in counting the political ballots; and that they saw no changes or alterations made in any of the ballots. They did not see them counted. The poll books and tally sheets were all signed by the judges and clerks within an hour and a half or two hours after seven o'clock.

Neither Mrs. Kaiser nor Mrs. Nice were called as witnesses by either party. The policeman Flynn was called as a witness by the government. He testified that he was present at the polling place after the polls closed; that he saw appellants McNamara and Kaiser there "handling the ballots at that time;" and that he accompanied the ballots from the polling place to the election commissioner's office and that the sack of ballots was not opened on the way. It was admitted that they were not altered after they were taken to the Marshal's office nor by the grand jury. He was not asked whether he saw any alterations made on any of the ballots.

█ The jury having returned a verdict of guilty, that view of the evidence and the inference reasonably to be drawn therefrom which is most favorable to the government must be accepted, Walker v. United States, 8 Cir., 93 F.2d 383, 392; Marx v. United States, 8 Cir., 86 F.2d 245, 250; Galatas v. United States, 8 Cir., 80 F.2d 15, 23.

Accepting the testimony of the experts, and of the policeman and considering their testimony in connection with all the other circumstances in evidence, we think the jury would be warranted in finding that alterations were made on the ballots during the period following the closing of the polls at seven o'clock in the evening. During that time 73 large ballot sheets were separately handled and were changed by erasing the crosses at the head of or in front of the candidate's names in the Republican columns and by making the crosses in the Democratic column. During all that time only eleven persons were present, the eight appellants and Mrs. Kaiser, Mrs. Nice and Flynn. The room was small and well lighted, and the parties were all within plain view of and in close proximity to one another. Four different persons participated in changing the marks on the ballots.

The government maintains that a conspiracy including all the appellants is shown by their intentional cooperation, acquiescence and inaction in the overt act of altering and changing the ballots.

Counsel for appellants contend that the evidence is insufficient to sustain a finding of conspiracy because (1) such a finding requires the basing of one inference upon another to complete the chain of circumstantial evidence; (2) the circumstances relied upon do not exclude every reasonable hypothesis other than the guilt of the appellants, and that the circumstances are susceptible of inferences favorable to the accused; and (3) that the failure of the United States Attorney to interrogate the witness Flynn when on the stand raises a presumption against the government.

█ It is a settled rule of law that "In conspiracy cases, the unlawful combination, confederacy, and agreement between two or more persons, that is, the conspiracy itself, is the gist of the action, and is the corpus delicti charged." The agreement must, therefore, be established before a conviction can be sustained. Tingle v. United States, 8 Cir., 38 F.2d 573, 575. The agreement, however, is a fact which, like most other disputed facts, may be proven by circumstantial evidence. Where the government relies upon circumstantial evidence to establish the conspiracy, the circumstances must be such as to warrant the jury in finding that the conspirators had some unity of purpose, some common design and undertaking, some meeting of minds in an unlawful arrangement, and the doing of some overt act to affect its object. See Marx v. United States, 8 Cir., 86 F.2d 245, 250, and cases there cited. Further, the circumstances relied upon must be not only consistent with the guilt of defendants, but must be inconsistent with their innocence. Spalitto v. United States, 8 Cir., 39 F.2d 782; Salinger v. United States, 8 Cir., 23 F.2d 48; Langer v. United States, 8 Cir., 76 F.2d 817. Applying these elementary tests to the evidence in the record, we entertain no doubt that there is substantial evidence to sustain the verdict.

As to the claimed lack of evidence to show when or where the ballots were altered. The direct evidence of the witnesses and the admissions of the defendants prove conclusively that the ballots were not tam-

pered with after they were taken from the polling place to the office of the commissioner of elections. The direct evidence also shows that not more than one or two of the changed ballots could have been wrongfully handled by any one before the polls closed at seven o'clock in the evening. These facts, taken in connection with the testimony of the expert in reference to the condition of the ballots as found by him, exclude every reasonable hypothesis other than that the ballots were altered at the polling place between seven o'clock in the evening and around nine o'clock when they were put in bundles and bound with wire for delivery to the commissioner of elections.

It is also claimed that, assuming the alterations in the ballots were made at the polling place in the evening of election day, that there is no evidence to warrant the jury in finding that the appellants or any of them participated in making the alterations, cooperated with those who did make them, or did anything or omitted to do anything which they should have done so as to indicate a common purpose or agreement; that there is no evidence that any of appellants even saw the alterations made or knew that the ballots were being changed. All of the defendant officials who did not actually handle the political ballots testified positively that they did not see and did not know that anything wrong was going on, and in corroboration they detailed how they had occupied themselves.

■ The jury was properly instructed as to the consideration of the defendant's testimony and the weight to be given it. But the jury had before it the facts that no calling of votes or response of tally was carried on; that about seventy-three large ballots were spread out with the other political ballots on the floor of the room and were in the course of about two hours separately handled and changed by erasures and by substitution of marks; that the changes were made in part at least by outside interested persons who had no lawful right to handle the ballots; that the room in which all the defendants were congregated in close proximity to each other was small and well lighted and that the ballots and the persons handling them were within the view and in the presence of all the defendants all the time, and that false certificates were signed by all the officials. The circumstances shown warranted the jury in finding that the defendants one and all

saw and understood what was done and that by signing and certifying to the false returns the officials participated in the overt act of the conspiracy. The cooperation of all the parties throughout the whole transaction fully warranted the jury in finding that there was a common understanding on the part of all participants.

■ It is argued that Kaiser, at least, should have been acquitted. He was not an election official. He stood on the government's evidence, and the court instructed the jurors that they should not consider against him any evidence introduced after his motion for directed verdict was overruled at the close of the government's evidence. At that point the evidence showed that he was a precinct captain; that he had been present at the polling place all day; and that in the evening when the ballots were being altered he was present in the room during the whole time and that he was himself handling the political ballots. The proof of what he did and of what was done in his presence is substantial evidence that he was a member of the conspiracy and participated in the overt act. Whether his guilt was established was for the jury.

■ Finally, it is claimed that because the government did not interrogate the police officer Flynn when he testified as a government witness, about the altering of the ballots, a presumption results that he would have given answers unfavorable to the government. His direct examination by the prosecutor and his testimony that he was in the poll room after the polls closed and until the ballots were taken away and that he saw defendants McNamara and Kaiser handling the political ballots, opened to the defendants full opportunity to cross-examine him as to the spoliations. But the government had a right to rely upon the circumstantial evidence. No prejudice to defendants is shown to have resulted from the government's failure to make direct inquiry of Flynn. No instruction was requested upon the right of the jury to draw an unfavorable inference from such failure to inquire. And if this court should add an inference or presumption that his testimony would have been unfavorable to the government, only the weight or quantum of the evidence before us would be affected. We are persuaded that the evidence was sufficient to sustain the conviction of all defendants and upon the whole record the judgments appealed from are affirmed.