**CARLSON et al. v. UNITED STATES.**

Nos. 4154–4165.

United States Court of Appeals
Tenth Circuit.

Feb. 19, 1951.

Rehearing Denied March 9, 1951.

Pickett, Circuit Judge, dissented in part.

Walter A. Raymond, Kansas City, Mo. (Kenneth C. West, William W. Cochrane, Jr., and William Farmer, all of Kansas City, Mo., on the brief), for appellants.

Eugene W. Davis and Malcolm Miller, Topeka, Kan. (Lester Luther, Topeka, Kan., on the brief), for appellee.

Before HUXMAN, MURRAH and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

The appellants in this series of cases were indicted in the United States District Court for the District of Kansas, in an indictment containing two counts. Count one charged them with entering into a conspiracy to violate the provisions of Section 415, Title 18 U.S.C. [1948 Revised Criminal Code, 18 U.S.C.A. § 2314], in that they conspired, confederated and agreed to transport and cause to be transported in interstate commerce goods, wares and merchandise, particularly wheat of a value exceeding $5,000.00 theretofore stolen, etc. The indictment set forth eight overt acts committed in furtherance of the conspiracy. Count two charged appellants with the substantive offense of transporting in interstate commerce 3,480 bushels of stolen wheat of the value of more than $5,000.00.

A trial was had to a jury and a verdict of guilty was returned against each of the appellants finding them guilty of both offenses and they were thereafter sentenced to a term of three years on both counts. The sentence on count two was made to run concurrently with that imposed on count one.

Numerous assignments of error are urged for reversal. It is urged:

1. There was no substantial evidence to establish the alleged conspiracy.

2. That there was no substantial evidence that wheat in excess of $5,000.00 in value was stolen and transported in interstate.

3. That there was no substantial evidence that the wheat which was sold at Wichita was the identical wheat that was purchased in Oklahoma.

4. That the circumstantial evidence relied upon by the Government is more consistent with innocence than with guilt.

5. That the trial court erred in admitting in evidence plaintiff's exhibits 94, 95, 96, and 97.

6. That one of the Government's attorneys, in the final argument, used language which was prejudicial. That the remarks were of such a nature that the jury would naturally take it to be a comment on the failure of the defendants to testify.

The record is long and the facts are involved and detailed. The evidence adduced generally showed that on June 22, 1948, Fred Carlson contacted an elevator operator at Braman, Oklahoma, and arranged for the purchase of four trailer loads of wheat at $2.11 per bushel. On the same day he appeared in a late model Chrysler automobile, together with four large semi-trailer trucks—three Brockways and one Mack, in which to load the wheat. These trucks were owned by Fred Carlson, John L. Owens, E. D. Ditto, and Smiley F. Griffey. There were seven or eight persons with Carlson and the trucks. Carlson, Ditto, and Griffey were identified by employees as some of those present. The trucks were loaded before noon on that day. During the weighing operations, Carlson and another of the defendants sat under the scale beam in the scale house. Difficulty was encountered in weighing at least one of the trucks because the scales were nervous and would not balance. Carlson refused to give his name and did not want invoices and stated that he was purchasing the wheat for a Clark Grain Company and was taking it to Kansas City.[1] He purchased a purported 2,086 bushels of wheat which he paid for in currency, mostly in one hundred dollars bills. A total of $4,402.56 was paid in this way. These loads cleared the Port of Entry at South Haven, Kansas from 12:20 to 1:55 P.M., of that date. Port of Entry applications, which the drivers made out themselves, disclosed transportation of wheat from Braman, Oklahoma, to Wichita, Kansas. In one instance the application stated that transportation was from Wichita to Wichita. This evidently was an error. Later in the day these trucks appeared in Wichita, arriving there in the late afternoon or early evening of that day, and were driven to the Kansas Milling Company where the wheat was sold.

1. The record fails to show the existence of such a Grain Company.

On June 22, 1948, a person in a large new sedan automobile called at an elevator in Jet, Oklahoma, to make arrangements to purchase wheat. The elevator manager thought this individual was Earl Murray, one of the appellants. The purchaser stated that he was anxious to buy this grain to take back to Kansas City since he did not want to go back empty. A little later on the same day two individuals in two large semi-trailers appeared at the elevator in Jet and purchased 1,112 bushels, 50 pounds of wheat, which they loaded into the two semi-trailers, paying $2.19 per bushel therefor, making a total of $2,437.11. The wheat was weighed on the elevator scales which were too short to weigh the entire tractor trailers at the same time, so that double weights were necessary both in weighing empty and in weighing loaded. These two trucks were owned by appellants William L. Watts and John T. Holt, and were driven by appellant Earl Murray and another defendant, not an appellant herein. Both of the trucks were driven on the scale by Earl Murray and his name appears on both of the scale tickets. They passed through the Port of Entry at Caldwell, Kansas, from 5:30 to 5:35 P.M. on the same afternoon. On the Port of Entry applications, made out by the drivers themselves, the origin of the vehicles is shown as Alva, Oklahoma, and the destination as Wichita, Kansas. These trucks were likewise driven to Wichita to be unloaded at the Kansas Milling Company at the same time that the above enumerated trucks were unloaded.

On June 20, 1948, appellants Petty, Watts, Sisco, Arthur Owens, and Holt came in three trucks with pup trailers—one a Reo, one an International, and one a Brockway —to the Sherrod Elevator at Ponca City, and bought 1,452 bushels, 30 pounds of wheat at $2.14 a bushel, paying therefor $3,346.28. The wheat was loaded into these trucks, two of them being loaded full and the other being loaded, at the direction of one of the parties, to approximately six inches from the top of the truck. The trucks and grain were weighed on a neighboring scale which was too short to weigh the outfits at one time. The trucks were

accordingly weighed separately from the pups, a jack being used to presumably take the weight from the portion of the vehicle which was not on the scale. These same outfits had obtained loads of wheat from the same elevator on June 17, 1948, and Holt had arranged for the purchase of the June 20 wheat. On the former occasion, appellants Holt and Reimer were present with the trucks and were also driving an automobile. Appellant John Owens was also identified as being present. These trucks were driven to Cherokee, Oklahoma. Appellants Sisco, Petty, A. Owens, Murray, John Owens and McNutt stayed at Ray's motel in Ponca City as late as June 18, 1948. Appellants Murray, Watts, Pratt, Holt, Sisco, A. Owens, Petty, Reimer and another defendant stayed in Cherokee and Alva from June 19 through June 21. On June 22, 1948, they cleared the Port of Entry at Caldwell, Kansas, between 6 and 6:20 P.M. The owners of these trucks were Holt, Reimer and Pratt. The drivers were Petty, A. Owens and Sisco. These trucks likewise were driven to Wichita and arrived at the Kansas Milling Company at the same time as the above enumerated trucks arrived there.

Between 9 and 10 o'clock of the evening of June 22, 1948, the entire group of nine trucks owned by Carlson, John L. Owens, Ditto, Griffey, Watts, Holt (2 trucks), Reimer and Paul Pratt were in consecutive line at the Kansas Milling Company and were unloaded between that time and 3 A.M. on June 23. Ditto, Murray, Carlson, Holt, John Owens, Watts, Arthur Owens and Smiley Griffey, and other defendants, were identified as being present with these trucks at the Kansas Milling Company. All of the weight tickets for the nine trucks were made out to John L. Owens. Earl Murray drove all the trucks on the scale. In the afternoon of June 22, before these trucks arrived at Wichita, John L. Owens had arranged to sell nine loads of wheat to the Kansas Milling Company at $2.09 per bushel. The defendants purportedly unloaded 8,212 bushels and 40 pounds of wheat for which John L. Owens, on June 23, received a check in the sum of $17,164.48. On the same

day, John L. Owens took the check to the bank and received cash for it.

On the night of June 22 and early morning of June 23, Holt, Reimer, Petty, Watts, Griffey, John Owens and Earl Murray were identified as being in a group of persons who stayed in six cabins at the Rock Motor Court in Wichita, Kansas. In the afternoon of June 22, Holt, accompanied by Reimer, signed the registration cards at the Rock Motor Court for himself, Paul Pratt, Floyd Petty, "Peg" Owens, Earl Murray, Wayne Sisco, Bill Watts, and another defendant. Some of the group stated that they were unloading grain until four o'clock in the morning. Five of the big outfits—trucks with pup trailers and tractor trailer outfits—were parked near this court. The night man at the motor court also obtained cabins at another court for other persons in the group with these trucks. The next day, June 23, after the group had gone, the manager of the motor court found a quantity of money wrappers for large bills left in the cabins occupied by the appellants.

We will consider first the question whether there was evidence sufficient to submit the substantive count to the jury and in turn to support its verdict and the judgment entered thereon. The gist of this offense is the transportation in interstate of property of a value of $5,000.00 or more theretofore stolen. To establish the offense, it was necessary to adduce evidence from which a jury could find that stolen wheat of a value of $5,000.00 or more was in fact transported from Oklahoma to Wichita. It is admitted that appellants sold approximately $7,500.00 more wheat in value in Wichita than they purchased at the three points in Oklahoma. There is no evidence in the record which would support a finding that they purchased this additional wheat at other places. There is also evidence that would support a conclusion and finding that this increased value did not in fact result from the purchase of additional wheat, but resulted from fraudulent manipulations of the trucks, resulting in false weights both when the trucks were being weighed empty and when they were weighed loaded, and that in each instance the weights were manipulated in appellants' favor. There is evidence that some of these manipulations occurred in Oklahoma where appellants purchased this wheat, as will more specifically appear in our consideration of count one, and resulted in the receipt by them of more wheat than they paid for. There is also evidence supporting a finding of manipulations at the elevator in Wichita where the wheat was sold. The only direct evidence on the question of stolen wheat in Oklahoma was by the elevator operator at Ponca City who testified that appellants took wheat from him for which they did not pay, but that he did not know the exact amount thereof. There was also evidence of manipulation of the jack in weighing at least one pup trailer in Oklahoma. But from none of this evidence can the inference be drawn as to the amount in value of said wheat obtained by appellants in Oklahoma and for which they did not pay. In the absence of evidence of probative value as to the amount of the stolen wheat which resulted from these manipulations in Oklahoma, there was no basis for the jury's determination that at least $5,000.00 in value thereof resulted from Oklahoma manipulations and that such wheat was transported to Wichita, Kansas. In the absence of such evidence, a jury could arrive at its verdict only by speculation and guess. We, accordingly, conclude that the trial court erred in submitting the substantive count to the jury.

To establish the conspiracy charge in count one, it was necessary to prove by competent evidence that appellants, by concerted actions, agreements and understandings, undertook to fraudulently obtain wheat in Oklahoma of a value of $5,000.00 or more and transport the same in interstate commerce, and that an overt act in furtherance of the conspiracy was committed by one of the conspirators. It was not necessary, however, to prove that wheat of a value of $5,000.00, or more, or that any wheat in fact was fraudulently obtained and transported. The offense was complete when the unlawful agreement was formulated and an overt act in fur-

therance thereof was performed. Nor was it necessary that the overt act constitute the crime that was the subject of the conspiracy or even that it itself be a criminal act. Although innocent in itself, an overt act is sufficient to complete the crime of conspiracy if performed in furtherance thereof. Holmes v. United States, 8 Cir., 134 F.2d 125; Bergen v. United States, 8 Cir., 145 F.2d 181, and cases cited. The overt act merely manifests that the conspiracy is at work. United States v. Offutt, 75 U.S.App.D.C. 344, 127 F.2d 336.

■ The jury having returned a verdict of guilty, on appeal we must take that view of the evidence and the inferences reasonably to be drawn therefrom most favorable to the Government and must sustain the verdict of the jury appealed from if there be substantial evidence to support it.[2]

■ The jury's finding that the appellants confederated, conspired and agreed together, and acted in concert to fraudulently obtain and transport wheat for which they did not pay, is abundantly sustained by the record. Much of the evidence supporting this statement has been set out heretofore. In addition to what has been said, the record shows that they went to Oklahoma with trucks of such capacity as are uncommon in this part of the country. Some of these trucks having pup trailers were connected with a "St. Joe" Hitch. This hitch could be manipulated so that when the trailer truck and the attached pup were separately weighed on scales too small to weigh them as a unit, the weights could be manipulated so as to produce false weights.[3]

There was evidence that at least in one instance the weights of one of such outfits was manipulated in Oklahoma. One witness testified that when the tongue of the trailer was jacked up, he noticed that when the jacking was being done that it affected the springs and that he became suspicious but did nothing more than require one load to be reweighed.

Sherrod, the owner of the elevator at Ponca City, testified that he had loaded the same trucks on a previous occasion and that he found on the second trip that there were approximately 200 bushels less wheat than on the first trip. There is evidence supporting the conclusion that Murray was an expert driver of these large trucks and was especially adept at manipulating the brakes in favor of the appellants both when weighing empty and when weighing the loaded trucks.[4] Thus, while there was

2. Shannabarger v. United States, 8 Cir., 99 F.2d 957; U. S. v. Manton, 2 Cir., 107 F.2d 834; Henderson v. United States, 9 Cir., 143 F.2d 681.

3. The pup trailer was attached to the truck with a tubular tongue fastened to the truck with a bolt. When the truck would be driven onto the scales to weigh, a hydraulic jack would be placed under the tongue just off the scales. The nut on the bolt fastening the tongue would then be loosened and the jack would be raised so as to presumably disengage the pup trailer from the truck while the latter was being weighed. When the pup trailer was being weighed, the process would be reversed so as to presumably release the weight of the truck. There was evidence that while the bolt through the hitch was free and loose during these operations by reason of the construction of the hitch, the tension between the two units was in fact not released.

4. There was testimony as to the operation of the brakes on the tractor-trailer outfits as follows:
   When the tractor part was being weighed as it approached the position on the scales, the trailer brakes were applied very severely. The tractor was left in gear and pulled against these brakes very hard. It pulled so hard that the tractor wheels would spin on dry concrete. The tractor brakes were then applied, pulling in a crouched position and against said brakes on the trailer and it was held that way, all brakes locked, while the weighing took place. When the trailer part to the outfit was weighed and as the tandem axles thereon were pulled up for weighing, the brakes were still applied between the tandem axles and as invariably the tractor and trailer unit would go too far through the scale house, it would require backing up against the set brakes on the trailer. The tractor would back up against the set brakes on the trailer. The tractor brakes would

a driver with each truck that appeared at Jet, Oklahoma, Murray drove both trucks onto the scales while being weighed, and again at Wichita he drove all nine trucks onto the scales during the weighing operations, although each truck had a separate driver with it. There is clear and convincing evidence that the weights of the trucks in Oklahoma were manipulated in appellants' favor. The weights of the empty trucks were recorded on the weigh tickets. When passing through the Port of Entry, the drivers were required to declare the weights of the empty trucks. The Government's Exhibit 94 records these weights. It shows that the recorded weights empty of these nine trucks as shown by the weigh tickets was 198,750 pounds, while their declared weight at the two Ports of Entry was only 176,750 pounds, making a total difference in appellants' favor of 22,000 pounds. Translated in another way, it shows that each truck averaged 2440 pounds more in weight on the scales at the elevator, where it was to the interest of appellants to have the empty trucks weigh heavy, than they did at the Port of Entry.

Considered individually, the weights of some of these trucks empty showed startling results. Thus, the truck driven by Petty empty weighed 8820 pounds more on the scales at the elevator than its recorded weight at the Port of Entry. The Murray truck weighed 4610 pounds more at the scales at the elevator than at the Port of Entry. The Greep truck weighed 3320 pounds more on the elevator scales than at the Port of Entry. These discrepancies are too startling and too great to be the result of an honest mistake and the jury was warranted in concluding that they resulted from overt acts of appellants in manipulating their weights in furtherance of the conspiracy. There is, of course, no way of establishing how much the weights of the loaded trucks were manipulated when they were driven back

onto the scales either at the elevators in Oklahoma or at the elevator in Wichita. But a conspiracy to defraud by manipulation of weights having once been established and the ability to manipulate weights having been shown, the jury would be warranted in concluding that the weights of the loaded trucks, as well as the weights of the empty trucks, were manipulated both in Oklahoma and at Wichita.

So there is evidence of substantial manipulations of weights at the three elevators in Oklahoma. These manipulations in themselves do not show how much wheat was thus fraudulently obtained in Oklahoma nor do we understand that this evidence was offered for that purpose. Rather it was offered together with all the other evidence and circumstances to prove that the intent of the conspirators was to steal and transport the required amount of wheat in value to constitute the offense charged.

A conspiracy having been established, the only question is what was its nature, scope and extent. We think when considered in its totality the evidence and the inferences deductible therefrom support the jury's finding that appellants entered into a conspiracy to transport in interstate wheat of the value of $5,000.00 or more having theretofore been stolen or fraudulently obtained. There is no contention nor evidence that would warrant the conclusion that there were two separate agreements or conspiracies. There being but one conspiracy, it must be viewed in its entirety. As has been stated, " * * * the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. * * *; and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it." American Tobacco Company v. United States, 6 Cir., 147 F.2d 93, 106.[5]

---

then be set and the brakes were also set on the trailer and the unit would be weighed in this position.

There is evidence that by these operations the center of gravity could be shifted so as to make the unit being weighed

either weigh heavier or weigh lighter than its actual weight.

5. United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333. See also Swift & Co. v. United States, 196 U.S. 375, 386–387, 25 S.Ct. 276, 49 L.Ed. 518.

The gist of the offense was to defraud by the manipulation of the scale weights to the end that appellants got more wheat than they paid for. The evidence supports the conclusion that they did manipulate the scales in their favor both when they purchased wheat in Oklahoma and when they sold it in Wichita. They did manipulate the scale weights so that they sold approximately $7500.00 worth of wheat more than they paid for in Oklahoma. Whether this resulted from a manipulation of the scales in Oklahoma so that they failed to pay for $7500.00 worth of wheat which they actually purchased or from a manipulation of the scale weights in Wichita, so that they were paid for $7500.00 worth of wheat which they did not have, is beside the point. The important point is that it established their ability to manipulate the scale weights to the extent of $7500.00 worth of wheat. If they could manipulate the scale weights so that they were paid for $7500.00 worth of wheat that they did not have, it is a reasonable deduction to assume that they could have likewise manipulated the scales in Oklahoma, so that they received that much more wheat there than they paid for. The fact that by manipulating the trucks on the scales at both points of purchase and sale, appellants were enabled to sell 3480 bushels more wheat of a value of $7483.79 than they paid for, warranted the jury in concluding that their purpose in going to Oklahoma was to defraud the vendor there to the full extent of their ability.[6]

Appellants' contention that the court erred in admitting plaintiff's exhibits 94, 95, 96, and 97, is not well taken. Exhibit 94 is a compilation of figures made by an accountant showing a comparison of the weights of the nine empty trucks at the places where the wheat was purchased, their weights at the Port of Entry, and again at Wichita. Exhibit 95 is a comparison of the weights of the loaded trucks in Oklahoma, at the Port of Entry, and at the elevator in Wichita. Exhibit 96 is a comparison of the weight of wheat on the trucks at the place of purchase, at the Port of Entry, and at the elevator in Wichita. Exhibit 97 is a comparison of the bushels of wheat purchased and sold and as shown by the records at the Port of Entry. All of this statistical data was taken from other exhibits which were introduced in evidence. It reduced these figures to concise form. It is not contended that the exhibits do not correctly reflect the information taken from a great number of individual exhibits. All the data shown by these exhibits was contained in other exhibits in evidence. Reducing it to a simpler form did not prejudice the rights of appellants and there was no error in the receipt of these exhibits.

Finally it is contended that the attorney for the Government in its closing argument committed reversible error in making remarks which would naturally and necessarily be construed by the jury as being a comment on the failure of the defendants to testify. An examination of the record which contains the remarks complained of does not show that prejudicial and reversible error was committed.

The judgment of the court on count two is reversed and as to it the cause is remanded with directions to dismiss count two. The judgment of the court on count one is in each case affirmed.

PICKETT, Circuit Judge (concurring in part and dissenting in part).

I cannot agree that there is substantial evidence to sustain the conviction on either count in the indictment. Congress, by enacting the National Stolen Property Act, Title 18 U.S.C.A. § 415 (1948 Ed. Sec. 2314), has seen fit to make it a federal crime to transport interstate property which had *theretofore* been stolen, feloniously converted, or taken feloniously by fraud only when the value of the property is $5,000 or more. If the property so transported is of

---

6. As stated by Judge Parker in Andrews v. U. S., 4 Cir., 108 F.2d 511, 514, the fact that goods exceeding the requisite value were transported pursuant to the agreement is itself evidence that the transportation of goods of such value was contemplated by the conspiracy.

the value of less than $5,000, it is not a federal crime and the punishment for whatever offense has been committed is left to the states. It is also a federal offense to conspire to transport in interstate commerce any property which had *theretofore* been stolen, feloniously converted, or taken feloniously by fraud having a value of $5,000 or more. Title 18 U.S.C.A. § 418a (1948 Ed. Sec. 371). Count One of the indictment alleges that the defendants from on or about June 10, 1948 to June 25, 1948, conspired to transport and cause to be transported in interstate commerce wheat of a value exceeding $5,000 theretofore stolen, fraudulently converted, and taken feloniously by fraud, and alleged eight overt acts to carry out this conspiracy. Count Two charged the defendants with a substantive violation of the National Stolen Property Act alleging that they transported and caused to be transported in interstate commerce from the State of Oklahoma to Wichita, Kansas, approximately 3480 bushels of wheat of the value of more than $5,000 which had theretofore been stolen, feloniously converted, or taken feloniously by fraud.

To prove both counts, the prosecution relied solely upon the activity of the defendants in connection with the purchase of nine truck and trailer loads of wheat in Oklahoma on June 20 and June 22, 1948, and the transportation of the same to Wichita, Kansas, on the 22nd of June. The evidence established that on June 20th some of the defendants purchased three loads of wheat from an elevator at Ponca City, Oklahoma; four loads at Braman, Oklahoma, on June 20, 1948; and two loads at Jet, Oklahoma, on June 22nd. The felonious fraud relied upon is the claim of unlawful manipulation of scales in favor of the defendants when the wheat was weighed. No particular attempt was made to prove such fraud in Oklahoma where the wheat was purchased. The prosecution labored at length to prove such manipulations in Wichita where the wheat was sold, and it appears that there is ample evidence from which proper inferences may be drawn that in the weighing of the trucks there, both loaded and empty, they were so handled that weights favorable to the defendants were indicated by the scales.

The seller of the four loads of wheat at Braman, Oklahoma, testified that the trucks were loaded "around a foot from full" and so far as he knew all the wheat obtained there had been paid for. The scales at Braman were large enough to weigh a truck and trailer combination at the same time. They could not be handled on this type of scale as they were at Wichita. At Jet the seller said that so far as he knew all the wheat obtained there had been paid for. The only complaint made in connection with the purchases in Oklahoma was at Ponca City. There the seller described the manner of handling the trucks on the scales but his testimony created no more than a suspicion. He estimated his loss at 200 bushels. There was a discrepancy in the weights given at the port of entry when the trucks entered Kansas from Oklahoma, but as I understand from the record the trucks were not actually weighed there, at least they were not weighed empty. This is the sum and substance of the evidence as to how the wheat was obtained, and as said by Judge Huxman it is insufficient to show that wheat acquired in Oklahoma by fraudulent means and thereafter transported to Wichita was of the value of $5,000 or more.

It is, of course, true that in a conspiracy case success of the conspiracy is not essential. The gist of the offense is the unlawful agreement and some overt act to effectuate it but the $5,000 provision does not lose its significance. It must be proved by substantial evidence that the defendants conspired and agreed to transport interstate property theretofore stolen, fraudulently converted, or taken feloniously by fraud having a value of $5,000 or more. The $5,000 valuation of the property agreed to be transported is an essential element of a federal crime and a failure to prove it is fatal. Backun v. United States, 4 Cir., 112 F.2d 635, 638; Andrews v. United States, 4 Cir., 108 F.2d 511, 515; Buchanan v. United States, 8 Cir., 164 F.2d 15; Crain v. United States, 5 Cir., 148 F.2d 615, 617. It may be that the circumstances are such as to indicate an unlawful combination between these defendants to defraud some-

body but the proof of an agreement to fraudulently obtain wheat in Oklahoma of the value of $5,000 or more and then transport it to Wichita is wholly lacking. The United States does not contend that there is direct evidence of the unlawful agreement. It relies upon circumstances. We know that a conspiracy is seldom proved by direct evidence and it is sufficient if the circumstances, acts and conduct of the parties are of such character to establish it. Young v. United States, 10 Cir., 168 F.2d 242, 245; Reavis v. United States, 10 Cir., 106 F.2d 982, 984; Wilder v. United States, 10 Cir., 100 F.2d 177, 182; Martin v. United States, 10 Cir., 100 F.2d 490, 495. A substantive violation may be proved in the same manner, so in this case where there is no evidence of the conspiracy except the transportation of the property the evidence must show that the property transported was of the statutory value. Under the proof here, when the substantive violation goes out the conspiracy count goes with it. Andrews v. United States, supra; Crain v. United States, supra; Buchanan v. United States, supra. To me there is no evidence of an agreement between the defendants to acquire wheat in Oklahoma by fraudulent means of the value of more than $5,000. They did purchase a total of 4730 bushels for which they paid $10,182.44 and some of the trucks were not loaded to capacity. No proof was offered as to what these trucks would hold. So far as the record shows there was no more than 4730 bushels of wheat in them when they left Oklahoma. Assuming that there is· sufficient evidence from which a legal inference may be drawn that there was a fraudulent manipulation of the scales at Wichita, we may not infer from this inference alone that a fraud existed in connection with the purchases in Oklahoma. Rosenberg v. United States, 10 Cir., 120 F.2d 935. Even if we could so infer, we cannot combine the results of the frauds in the two states to make up the statutory valuation of the property transported. The statute requires the value to exist before the interstate transportation to constitute a violation of the federal act. It is not difficult to understand why a jury would con-

vict in a case like this when the issue of guilt or innocence is submitted to it. The burden, however, was upon the United States to prove beyond a reasonable doubt that the defendants conspired to transport interstate property of the value of $5,000 or more which had theretofore been stolen or feloniously obtained by fraud. We should not permit a relaxation of time-honored requirements of proof in criminal cases or extend federal jurisdiction because it appears that the defendants may have been swindlers.

I think the court should have directed a verdict as to both counts.