James Doyle CAVE, Appellant,

v.

UNITED STATES of America, Appellee.

Sanford Samuel AMSTERDAM, Appellant,

v.

UNITED STATES of America, Appellee.

Calvin Dennis SIRKIN, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 18859, 18895, and 18938.

United States Court of Appeals Eighth Circuit.

March 1, 1968.

Rehearing Denied March 22, 1968.

James Lawyer, Des Moines, Iowa, for appellant Cave.

Theodore T. Duffield, Des Moines, Iowa, for appellants Amsterdam and Sirkin and filed brief; Anthony Critelli, Des Moines, Iowa, for appellant Sirkin was on the brief.

Jerry E. Williams, Asst. U. S. Atty., Des Moines, Iowa, for appellee; James P. Rielly, U. S. Atty. and Claude H. Freeman, Asst. U. S. Atty., were on the brief.

Before VAN OOSTERHOUT, Chief Judge, MATTHES, Circuit Judge, and HARRIS, Chief District Judge.

OREN HARRIS, Chief District Judge.

The appellants bring these appeals from convictions by a jury and judgments

entered thereon finding them guilty upon each of two counts of an indictment. The Grand Jury of the Southern District of Iowa on May 26, 1966, returned a two count indictment against James Doyle Cave, Calvin Dennis Sirkin (also known as Harry Karl), and Sanford Samuel Amsterdam (also known as Jake Jackson) involving conspiracy and interstate transportation of property obtained by fraud. The cases were submitted on the original files and briefs.

Count I of the indictment charges conspiracy in violation of Title 18 U.S.C. § 371;[1] Count II of the indictment charges interstate transportation of property obtained by fraud in violation of Title 18 U.S.C. § 2314.[2] The indictment is rather lengthy and it appears unnecessary to restate it here as no question of its sufficiency is raised by appellants and pertinent provisions will be included in the statements summarizing the evidence.

Judgments of convictions were entered by the Honorable Roy L. Stephenson, Chief Judge, presiding. Calvin Dennis Sirkin (Harry Karl) and Sanford Samuel Amsterdam (Jake Jackson) were each sentenced on Count I to imprisonment for a period of five years and fined $10,000, and on Count II to imprisonment for a period of five years to run concurrently with the sentence imposed on Count I. James Doyle Cave was sentenced to imprisonment for a period of two years and fined $3,000 on Count I and on Count II to imprisonment for a period of two years to run concurrently with the sentence imposed on Count I.

Separate appeals have been taken. Appellant Cave files a separate brief. Appellants Amsterdam and Sirkin have filed their briefs jointly. All appeals will be disposed of in this opinion.

The three appellants contend that the court erred in failing to direct a judgment of acquittal for the reason that the Government failed to establish the jurisdictional value of $5,000. In addition thereto Appellant Cave contends (1) the evidence was insufficient to establish the allegations as to him; and (2) the Court erred in admitting testimony and exhibits which were hearsay, incompetent, irrelevant and immaterial as to him. However, at the close of the Government's case when Appellant Cave filed a written motion of his claims of error Appellants Amsterdam and Sirkin orally adopted Cave's formal motion in connection with their motion of acquittal at that time. We examine these claims and recite the facts applicable to each of them.

■ Except for one exhibit offered by defendant Cave, appellants failed to testify, or offer any evidence in their own defense, which is their right. Nevertheless, the testimony of the Government is uncontradicted, except as to any possible discrepancies in the testimony of matters relevant to the case.

In view of the nature of these cases and variance in the rule of law applicable thereto, a rather full and complete statement of the facts appears to be necessary.

The evidence discloses that in August, 1965, Pearl Michlin was the sole owner of an Iowa Corporation, Super Drug, Inc., a retail drug business located at 609 Walnut Street in Des Moines, Iowa. The drug store was actually operated by her husband, Harry Michlin, assisted by their son Franklin. Harry Michlin also was the owner of a drug store, King's Pharmacia in San Juan, Puerto Rico.

During the early part of the summer, 1965, the Michlins advertised the sale of Super Drug in the local newspapers and

1. Section 371. "If two or more persons conspire * * * to commit any offense against the United States, * * * in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than 5 years, or both. * * *"

2. Section 2314. "Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; * * *

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both. * * *"

a well-known trade magazine. In July, 1965, Harry Michlin received a telephone call from Lew Farrell indicating an interest in the proposed sale and arranged a meeting for the purpose of discussing it.

A few days later Mr. Michlin joined Mr. Farrell at the Des Moines airport. Farrell had with him Allen Robert Rosenberg introduced to Michlin as Mr. Allen, and another man unnamed. Allen (Rosenberg), a large person, some six feet two inches or more tall, weighing 240 pounds, talked to Michlin about the sale of Super Drug. No commitment was made and no agreement for any further meeting.

On or about August 11, 1965, Mr. Allen called Mr. Michlin and asked that he meet him at the Des Moines airport. On arriving at the airport Michlin was introduced to a Mr. Harry Karl by Allen. It later developed and is admitted that Harry Karl is in fact Calvin Dennis Sirkin, one of the defendants herein.

Mr. Michlin took Mr. Allen (Rosenberg) and Mr. Sirkin (Harry Karl) to the Super Drug store. He showed Sirkin around the store and explained its operation. On inquiry from Allen, Michlin advised that the liabilities and the assets, including fixtures of the business were each about $25,000. Michlin asked $10,000 for the corporate stock on behalf of his wife. There was further discussion between Sirkin and Michlin at the store; Allen had left. After he returned, Allen and Michlin left Sirkin at the store and went to the home of Lew Farrell where an agreement was made to transfer all of the stock of Super Drug, Inc., to Harry Karl (Sirkin). Michlin and Allen returned to the store. They had an additional conference with Sirkin and all three agreed to the terms of the sale.

Sirkin thus obtained control of the assets of the corporation, which included the inventory, store fixtures and the corporation's bank account with a balance of some $1300.00. In return Sirkin was to issue to Mrs. Michlin two checks in the amount of $2,000 each on the Super Drug, Inc., bank account; one check postdated two weeks following the con-summation of the sale and one postdated four weeks following the consummation of the sale. Michlin gave Sirkin a list of the liabilities of the corporation. He guaranteed its accuracy within ten percent. It was further agreed that if the liabilities exceeded those listed, plus ten percent, the excess would be deducted from the $4,000 to be paid for the stock in postdated checks.

In further consummation of the sale Mr. Michlin authorized his attorney to prepare the necessary papers and his son Franklin accompanied Sirkin to the Valley Bank & Trust Company where control of the bank account of the corporation was transferred to Harry Karl (Sirkin).

On returning to the drug store Harry Karl (Sirkin) issued two checks, each in the sum of $2,000 payable to Pearl Michlin on the Super Drug, Inc., account; one was dated August 19, 1965 and the other dated August 26, 1965. The arrangements for the transfer of the stock and the consummation of the sale were thus completed August 11, 1965. The ownership and operation of the drug store and all activities were thereafter carried on in the name of Harry Karl.

Before leaving for Puerto Rico on August 14 or 15, 1965, Harry Michlin introduced Sirkin as Harry Karl, the new owner of Super Drug, to Herbert Collins, the pharmacist. Collins was asked to remain as pharmacist of the store and agreed. At Michlin's suggestion another former employee, Larry Christensen, was employed by Karl on a part-time basis. Karl also employed Marie DeBrouse as cashier.

Under Karl's management of the drug store the stock of merchandise immediately went down. The employees noted that Karl failed to maintain the stock and inquired about it. Karl stated that Michlin had misled him regarding the liabilities of the business and as a consequence the store was short of cash. This concluded one phase of the sequence of events and began another.

On August 30, 1965, another individual, Sanford Samuel Amsterdam, one of the defendants herein, arrived at the drug

store and was introduced to the employees by Harry Karl as Jake Jackson, the new bookkeeper. The office was located in the basement of the store. Amsterdam, known as Jake Jackson, went to the office where he spent most of his time. When employee Christensen arrived at the store that afternoon, Karl (Sirkin) took him to the basement and introduced him to Jake Jackson (Amsterdam) as "Jake" and advised that Jake was a partner in the business.

The next day, August 31, 1965, Karl told Marie DeBrouse that some big items would be coming to the drug store and when they arrived she was to notify Jake (Amsterdam) and that he would come up from the office and take care of them. Karl also advised her that if she had any problems, to take them up with Jake. There was a telephone in the basement office and it was from this office that Karl and Jake conducted most of their activities.

During the day, August 31, 1965, Elmer Harleen, a partner in Central TV Sales located in Des Moines, received a telephone call from a man who identified himself as Harry Karl, manager of Super Drug. He told him that he wanted a certain color television-phonograph combination for promotional purposes at his store. Harleen did not have this particular set but did have a comparable model. Karl placed an order for it and inquired as to the price. He was quoted a retail price of $975.00. The caller stated that he just wanted the set brought down and set on the floor; there would be no service or installation; and it would be a cash sale on delivery; with this representation a price of $875.00, plus sales tax, was agreed to. Harleen made up an invoice and arranged for the delivery of a RCA Model HG883L, Serial Number 16CA9819. It was delivered to Super Drug where a check was given in the sum of $892.50 drawn on Super Drug, Inc., signed by Harry Karl. The check was later presented for payment and returned marked "Account Closed".

Also, later that day, August 31, 1965, B. A. Amos, a salesman for Mitcham TV of Des Moines, received a call from a person who represented Super Drug and wanted a color television set to be given as a prize for promotional purposes. The sale of a RCA Model 881W was consummated at a price of $975.00; delivery was made to Super Drug and a check was issued therefor in the sum of $975.00 drawn on Super Drug, Inc., signed by Harry Karl. When the check was presented for payment it was returned marked "Account Closed".

Also, on August 31, 1965, Charles Gilderbloom, manager of the electrical appliance department at Younkers Department Store, returned a call from a Mr. Harry Karl at Super Drug. Karl wanted to buy a RCA Model HG761W color television set to give away as a prize. He asked for a special price. The retail price was $765.00. Gilderbloom agreed to sell the set for $634.80, plus sales tax, on a cash sale basis. Mr. Gilderbloom made out the sales ticket and arranged for delivery the next day, September 1, 1965. On delivery, a check was issued on the Super Drug, Inc., bank account, signed by Harry Karl. When presented for payment it was returned marked "Account Closed".

On August 31, 1965, Mr. Karl called Gene Nicholson Stores and talked to Mark Summey, a salesman. He identified himself from Super Drug. He wanted a combination color TV-radio-phonograph to be used as a gift. A Curtis-Mathes Model U321BMX was sold and delivered for $700.00, plus sales tax. On delivery to Super Drug a check in the sum of $714.00 drawn on Super Drug, Inc., and signed by Harry Karl was given. When the check was presented for payment it was returned marked "Account Closed".

On August 31, 1965, Kenneth Kalsem, owner and manager of Ingersoll TV located in Des Moines, received a call from a person identifying himself as Harry Karl with Super Drug. He wanted a color combination TV set for a promotional purpose. He explained it would be a cash sale on delivery. A price of $650.00, plus tax, was agreed to and a

Zenith 7050W was delivered to Super Drug. A check was given in the sum of $663.00 drawn on Super Drug, Inc., signed by Harry Karl. The check was presented for payment and returned marked "Account Closed".

Also, on August 31, 1965, Ed Orth, Salesman for Philco Distributors, Inc., received a telephone call from the new owner of Super Drug. He wanted a Philco air conditioner to use as a door prize for promotional purposes. A price of $189.54 was agreed to on a cash sales basis. A Philco Model 9AC54 air conditioner was delivered on September 1, 1965, to Super Drug, through an error by the deliveryman it was delivered on a credit basis rather than C. O. D. Philco Distributors, Inc., was never paid for the unit by Super Drug.

On August 31, 1965, Dale McCombs, an order clerk employed by Gifford-Brown, Inc., in Des Moines, received a call from a person identified as Harry Karl of Super Drug. He wanted to purchase an air conditioner for a door prize on reopening of his store. A Chrysler Model H-1353 was purchased for $198.00, plus sales tax. It was delivered to Super Drug on September 1, 1965. A check was issued in the sum of $201.96 drawn on Super Drug Inc., signed by Harry Karl. The check was returned when presented for payment marked "Account Closed".

On August 31, 1965, Harry Kramer, owner of Midwest Vacuum Cleaner Company in Des Moines, received a telephone call from a man who identified himself as Harry Karl of Super Drug. He wanted to purchase six upright vacuum cleaners for promotional purposes. A price of $49.00 each for the six units was agreed upon and Kramer personally delivered them to Super Drug. He received in return a check in the amount of $294.00, drawn on Super Drug, Inc., signed by Harry Karl. The retail price for each unit was $59.00. When the check was presented for payment it was returned marked "Account Closed".

On August 31, 1965, Rudolph Pidgeon, manager of Pidgeon's Store in Des Moines, received a telephone call from a man who identified himself as Harry Karl and wanted to purchase an air conditioner for promotional purposes at his store. They agreed on a price of $175.00, plus sales tax for the purchase of a Model 409 General Electric air conditioner. The unit was never delivered because in making up the delivery ticket an erroneous address was entered.

On August 31, 1965, James Hauck, an employee of A & A Television, located in Des Moines, received a call from a man representing himself from Super Drug and wanted to obtain a color television-combination set to give as a prize in his promotional program. Hauck advised that he did not have such a combination set in stock. The caller requested him to ascertain the price of a set of this kind and call him back. This particular television set was in the price range from $800.00 to $1200.00. It was not ordinarily stocked by A & A Television. Hauck called the Des Moines Credit Bureau and made inquiry regarding Super Drug. From the information he received he advised Super Drug he was not interested.

The evidence further reveals that on August 31, 1965, the employees at the store observed four television sets and six vacuum cleaners delivered to the store. On each delivery "Jake" (Amsterdam) came up from the basement office and gave an envelope to the deliveryman, except on one or two occasions he gave it to Mrs. DeBrouse to give to the deliveryman. When the pharmacist Collins and Mrs. DeBrouse, the cashier, asked Karl about the merchandise being delivered he stated that he was going to give them away as prizes in a drawing on the Grand Opening.

The various items delivered on August 31 were in the store when both Mr. Collins and Mrs. DeBrouse left at 6:00 p. m. When they returned the next morning for duty at 9:00 a. m., September 1, 1965, the merchandise had been removed.

On September 1, 1965, at 7:03 a. m., James Cave, a defendant herein, rented a sixteen foot van lift truck from Greater

Iowa Leasing Co. It was returned at 9:45 a. m., on the same day.

Also, on Wednesday, September 1, 1965, when the two air conditioners, and a color television set were delivered to the Super Drug Store, Jake came from the basement and gave an envelope to each deliveryman. Observing the activity, Mr. Collins, the pharmacist, told Mr. Karl (Sirkin) that it appeared to him something "phony" was going on and requested his pay for the days he had worked that week before leaving the store. Collins also informed Karl that in the future he wanted his pay at the end of each day.

During the afternoon of the same day employee Christensen went to the store for his check. Karl and Jake informed him that they were going to change the store to a drug store with an electrical appliance section. It would be necessary to get the merchandise out of the store as the painting contractors were coming in to remodel. They asked Christensen to work that night, which he did. Christensen had not worked on August 31, but on that day, September 1, he observed the large console color television set and air conditioners in the store. He testified that he heard conversation between Karl and Jake about taking all merchandise to a warehouse.

Also, before Mrs. DeBrouse left that evening Karl told her he was closing the store for remodeling for a week or so, and he would call her when to come back to work.

In the sequence of events defendant Cave went to the Bethel Mission Transient Shelter for Men, about 7:45 p. m., September 1, 1965, where he arranged with Rev. Perry, assistant superintendent, for three men to load a truck. Charles White, John Viola and Harold McMains were selected. Cave was known to them only as "Jim", and he drove them from the Mission to the back door of the Super Drug store. En route to the store Cave told them he had about four hours work for them, packing and moving things, for which he would pay $1.50 an hour.

When they arrived at the store Cave rapped on the back door. It was unlocked and opened. He and the three men entered. Cave was in his car from which he unloaded new boxes and brought them into the store. Cave introduced White, Viola and McMains to defendant Amsterdam as "Jake" and told them that he, Jake, would tell them what to do. Viola put new boxes together and the others, including Karl and Jake, took the merchandise from the shelves and put it in the boxes. Employee Christensen assisted in this work until about 10:30 p. m.; Cave was still in the store when Christensen left. Christensen heard Cave on the telephone calling rental agencies for trucks to move the merchandise. Cave inquired of the three laborers from the Mission if either of them could drive a truck; White volunteered. When White left to go get the truck, Cave left the store. Packing continued until about 11:45 p. m. Defendant Sirkin was giving most of the orders and he and Amsterdam spent considerable time talking on the telephone.

Before 12:00 that night Cave returned and picked up laborer White to take him to Greater Iowa Leasing Corporation to get a truck. On the way Cave said that he had to meet a man at the airport at midnight. He drove to the airport and left White in the car while he went into the terminal building; he came out momentarily got into the car and said "I missed my fellow but maybe he's down to the house". On the way back he stopped at Lew Farrell's house at 3600 Fleur Drive. A large, heavy set man and another younger man came out and Cave advised them that he had missed the man at the airport. The other two men got into a car and left. Cave went into Farrell's house to use the telephone. The other two men came back in about five minutes and advised Cave they had found the man. Cave advised that he would see him later. The other man remained unidentified.

Cave then drove laborer White in his car to Greater Iowa Leasing Corporation; they both went into the office.

Since prior arrangements had been made for the rental of a twenty foot van lift truck, this truck was rented to Charles Robert White, the laborer, for "Parker Super Drug" at 12:08 a. m., September 2, 1965. Cave did not go back to the drug store, but White drove the truck back and parked it on a side street as he had been instructed by Jake (Amsterdam). White knocked on the front door and Amsterdam let him in. Since they were ready to load they instructed White to back the truck up to the door.

Defendants Sirkin and Amsterdam and the three laborers began loading the truck. It became apparent that the truck would not hold all of the merchandise. Amsterdam gave White $4.00 and instructed him to take a cab to the leasing company and get another truck. White returned to Greater Iowa Leasing Corporation at 2:16 a. m., obtained an eightteen foot van lift truck, which he drove back to the store.

These two defendants and the three laborers completed the loading about 4:45 a. m. All the merchandise, including the television console and air conditioners, had been removed from the store and loaded into the trucks. The laborers were paid for their work.

Sirkin remained at the store. Amsterdam with White, Viola and McMains drove the loaded trucks to the Western Transportation terminal where they were parked at Amsterdam's direction. Amsterdam then went into the terminal where he contacted Joe Frank, manager of the Des Moines terminal of Western Transportation Company. Amsterdam identified himself as Jake Jackson, an employee of Super Drug, and said that he wanted to load a trailer to go to Chicago. Frank advised him he would have to wait until daylight; it was then about 5:00 a. m., September 2, 1965. Amsterdam asked White, Viola and McMains if they would come back later in the morning and transfer the merchandise from the trucks into a trailer, the three agreed. Amsterdam gave McMains a telephone number and asked that he call him at 9:30 that morning.

At 9:00 a. m. Collins, the pharmacist, went to Super Drug to begin his day's work. He found the store locked, brown paper covering the windows, and a sign on the door which said "Closed for Remodeling".

About 9:30 a. m. that morning McMains called Amsterdam; on instructions to meet him at 10:00 a. m., at the Western terminal, McMains, White and Viola went to the terminal. In a few minutes Cave and Amsterdam arrived. Amsterdam went into the terminal where he contacted Jerry Almond, an employee of Western. Amsterdam identified himself as Jake Jackson, a representative of C & M Merchandise Company. He furnished Almond necessary information to prepare a bill of lading for shipment of 125 cartons of drug sundries weighing 16,000 pounds and five television consoles from C & M Merchandise, Inc., Des Moines, to C & M Merchandise, Inc., 4444 N. Milwaukee, Chicago, Illinois, on Western Trailer No. 460.

On instructions from Amsterdam, Cave, White, Viola and McMains transferred the merchandise to Trailer 460. While this was being done Amsterdam told McMains that part of the merchandise was going to Chicago and part of it was going to Detroit.

After the first rented truck of Greater Iowa Leasing Corporation had been emptied, Cave advised White he had more "stuff" to be picked up and instructed White to take the truck to 63rd Street, North of University Avenue, and wait for him. White went to the designated place and waited. Cave and Amsterdam arrived by car in a few minutes. White was directed to back the truck into the driveway of 1707 63rd Street, occupied by Miss Darlene Bradley. Miss Bradley was Cave's friend for many years and worked for him as an employee in a club. She testified that Cave had access to her garage and had permission to use it. Cave, Amsterdam and White removed four television consoles and a number of small boxes out of the garage and loaded them on the truck. White drove the truck back to Western's terminal.

When they arrived the second rented truck had been unloaded and they then loaded onto the trailer the merchandise brought from Miss Bradley's garage. The doors of the trailer were closed. The rented trucks were returned to Greater Iowa Leasing Corporation. The trucks were checked in by Cave and Amsterdam at 2:04 p. m., September 2, 1965.

Defendant Amsterdam promised the three laborers if they would "come" to Chicago he would give them jobs of the same type of work and pay them $100.00 to 150.00 a week. Amsterdam wrote on a paper what was purported to be his home phone number in Chicago and signed his name "Jake Jackson" on the slip, which he gave to White. They went to Chicago later and attempted to contact "Jake Jackson" at the number given to them, but were unsuccessful.

The activities for the three days at Super Drug were reported and during the afternoon of September 2 Collins went to the store with the Iowa State Pharmacy Examiner to check the narcotics. They found the narcotics were still in the cabinet but all the merchandise was gone.

Harry Michlin deposited the two checks given to Mrs. Michlin in the sum of $2,000 each, but they were returned marked "Payment Stopped", and they were never paid.

Defendant Cave was an employee of Iowa Power & Light Company. He stated to Agent Mullaney of the Federal Bureau of Investigation that he first became acquainted with Karl several years prior to these events when Cave was operating a Key Club in Des Moines. Karl was a patron and claimed to be from Detroit. Cave said he accidentally ran into Karl in Des Moines at which time Karl told him that he had purchased Super Drug from Harry Michlin. Cave claims that Karl contacted him for assistance in obtaining trucks and some laborers to move merchandise. He said that Mr. Karl informed him that he had been ordered or instructed by his landlord to vacate the premises, which was

the reason for his moving the stock. Cave went on to relate to Agent Mullaney the events of his participation as has been described.

Defendant Cave was shown a photograph of defendant Sanford Samuel Amsterdam (Jake Jackson) by Special Agent Mullaney and asked Cave if he knew or recognized him. Cave stated that he did not.

On September 4, 1965, Amsterdam was arrested in Chicago by officers of the Chicago Police Department. He was interviewed by Special Agent Perkins of the F. B. I., during which time he stated that he had recently won $13,000 from Harry Karl in a gin rummy game at the Super Drug store in Des Moines, Iowa. After the game Karl had requested him to take the winnings in the form of money orders. He would not say what date the card game took place, but did say that he was in the Super Drug store in Des Moines the day following the game and all the merchandise was there at the time.

On September 7, 1965, Trailer 460 arrived at the terminal of Western Transportation Company in Chicago, Illinois. Western attempted to make delivery to the consignee without success. The trailer was stored temporarily, and by order of the United States District Court for the Southern District of Iowa, Western returned Trailer 460 to Des Moines consigned to John Landess, Receiver in Bankruptcy of Super Drug, Inc. The trailer arrived in Des Moines September 24 still sealed with the seal number which had been issued to Amsterdam on September 2 at the Des Moines terminal. The trailer was opened and found to be filled with the merchandise that included the various items described herein. Each of the items were subsequently returned to the suppliers through action of the Bankruptcy Court.

IN THEIR ATTACK ON THE JUDGMENTS OF CONVICTION THE APPELLANTS VIGOROUSLY INSIST THAT THE GOVERNMENT FAILED TO ESTABLISH JURISDICTIONAL

VALUE AS REQUIRED BY LAW. TITLE 18 U.S.C. § 371.

We first dispose of this contention as applicable to Count I of the indictment which charges that the defendants entered into a conspiracy between themselves and other unknown persons to commit an offense against the United States by transporting in interstate commerce goods, wares and merchandise of the value of more than $5,000, which the defendants knew to have been taken by fraud.

That there was a conspiracy committed is undisputed. It is also undisputed that one or more of the defendants committed overt acts to effect the object of the conspiracy.

It is further undisputed that some goods, wares and merchandise obtained by fraudulent representations were transported in interstate commerce through the combined efforts and actions of the defendants.

In each of the transactions with the ten business establishments described herein, the caller, who claimed to be either Mr. Karl, or a representative of Super Drug, Inc., made representations that the merchandise was to be used for "give away", or "prizes" for promotional purposes.

Title 18 U.S.C. § 2311 provides as follows:

"As used in this chapter:

" * * *

" 'value' means the face, par, or market value, whichever is the greatest, and the aggregate value of all goods, wares, and merchandise * * referred to in a single indictment shall constitute the value thereof."

Appellants contend that the aggregate cost (wholesale) of the merchandise shipped in interstate commerce from Des Moines, Iowa, to Chicago, Illinois, amounted to $3,806.34; that actual sales price claimed to be market value as willing seller to a willing buyer $4,769.90; and that the suggested retail price by manufacturers to be $5,131.90. They submit a table to further substantiate their contention as to appropriate value to be placed on these items from the eight businesses obtained under false representations.

The defendants strenuously insist that the actual sales price agreed upon in each instance should be the market value and thus aggregating less than $5,000.

The government contends and also submits a table which shows the price to be paid for the eight items to be $4,577.60; the retail price $5,134.60; and the retail price upon the appellants' notes found in the basement office entered as testimony to total $5,363.96.

This is not a new question to the courts. It has been uniformly held that the value of property taken by fraud is the market value at the time and place of taking. Husten v. United States, 95 F.2d 168, 171 (8 Cir., 1938), and cases cited therein. The retail or market value was properly used by the district judge. Kowalchuk v. United States, 176 F.2d 873, 876 (6 Cir., 1949); Gordon v. United States, 164 F.2d 855, 859 (6 Cir., 1947); Husten v. United States, supra.

The trial court instructed the jury that in the present case the market value would be the retail market value. The items involved were of the same character and quality for the retail trade and were generally produced for the purpose of sale at retail. They had an individual retail market value. Therefore, the retail value should prevail over wholesale or replacement value. Herman v. United States, 289 F.2d 362 (5 Cir., 1961); Husten v. United States, supra.

In Herman v. United States, supra, the court said:

"The standard test for determining market value of stolen property is the price a willing buyer would pay a willing seller at the time and place the property was stolen. * * * General retail value would naturally include a reasonable mark-up, and evidence as to retail value of the goods is properly admissible."

■ The qualifications of the witnesses from the various businesses are not questioned. Each testified as to the value of the merchandise and it was proper to receive the testimony in evidence as to the retail value of these items along with other values submitted in the tables of the parties. Gordon v. United States, supra.

The defendants rely heavily on the case of United States v. Willis, 322 F.2d 548 (3 Cir., 1963), as a case almost identical to the factual situation here. That case is distinguishable, however, in that it was reversed because the witness who furnished exhibit showing alleged retail value of the goods, admitted that he was not qualified as an expert to furnish an opinion as to the retail value. The court held the admission of this testimony was prejudicial error since the exhibits were the only proof from which the jury could infer that the merchandise in question had a market value of $5,000 or more.

However, this is a charge of conspiracy. The testimony established that there were two additional items with values not included in the table of either party. A Model 409 General Electric air conditioner at a price of $175.00, plus tax, was ordered from Pidgeon's Store in Des Moines in the same manner as orders from other businesses. The overt act in furtherance of the unlawful scheme was performed by the telephone call and agreement to purchase.

Also, an attempt was made to purchase a color television-combination set from A & A Television in Des Moines, which had a minimum price of $800.00. The overt act was performed by the telephone call, even though the purchase failed because of the acuity of the employee of the company.

■ Assuming arguendo, but not deciding, the defendants admitted value of $4,497.44 of the items actually delivered and transported in interstate commerce to be the proper value that should be used. The two additional items they attempted to obtain but not delivered with a value of $975.00 would bring the total aggregate to $5,472.44.

"It is not necessary to a conviction of a party to the conspiracy that he perform any overt act, or that the conspiracy succeed. Conviction may rest on proof of the doing of any overt act by any of his co-conspirators for the purpose of effecting the object of the conspiracy, and it is not necessary to conviction that the overt act in itself be one prohibited by law." Bergen v. United States, 145 F.2d 181, 187, 188.

■ The offense of conspiracy is complete when an agreement is made to commit an unlawful act and any overt act is made in the furtherance of the agreement whether or not the contemplated crime is consummated. Marx v. United States, 86 F.2d 245, 249, (8 Cir., 1946); Pinkerton v. United States, 328 U.S. 640, 644, 66 S.Ct. 180, 90 L.Ed. 1489; United States v. Bayer, 331 U.S. 532, 542, 67 S.Ct. 1394, 91 L.Ed. 1654; Carlson v. United States, 187 F.2d 366, 369 (10 Cir., 1951).

In the Carlson v. United States, supra, this question was carefully delineated on a similar charge:

"To establish the conspiracy charge in count one, it was necessary to prove by competent evidence that appellants, by concerted actions, agreements and understandings, undertook to fraudulently obtain wheat in Oklahoma of a value of $5,000.00 or more and transport the same in interstate commerce, and that an overt act in furtherance of the conspiracy was committed by one of the conspirators. It was not necessary, however, to prove that wheat of a value of $5,000.00, or more, or that any wheat in fact was fraudulently obtained and transported. The offense was complete when the unlawful agreement was formulated and an overt act in furtherance thereof was performed. Nor was it necessary that the overt act constitute the crime that was the subject of the conspiracy or even that it itself be a criminal act. Although innocent in itself, an overt act is suffi-

cient to complete the crime of conspiracy if performed in furtherance thereof."

We think the question of value as applicable to the charge of conspiracy in Count I was properly and correctly presented to the jury for its determination and the evidence sufficient.

Appellant Cave next contends:

THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THE ALLEGATIONS OF THE INDICTMENT AS TO HIM AND THE COURT ERRED IN FAILING TO SUSTAIN DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL MADE AT THE CLOSE OF GOVERNMENT'S EVIDENCE AND AT THE CLOSE OF ALL THE EVIDENCE AND MOTION FOR JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT.

Defendants Sirkin and Amsterdam adopt this contention of defendant Cave in the record, but do not argue it in their brief.

It is a well established rule that in considering the record on appeal in a criminal case from a jury verdict of guilty, the appellate court must take that view of the evidence which is most favorable in support of the verdict and accept as established all reasonable inferences that tend to support the action of the jury. McClard, et al. v. United States, 386 F.2d 495 (8 Cir., December 4, 1967); Koolish v. United States, 340 F.2d 513, 519 (8 Cir., 1965), cert. den. 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965); Smith v. United States, 331 F.2d 265, 278 (8 Cir., 1964), cert. den. 379 U.S. 824, 85 S.Ct. 49, 13 L.Ed.2d 34 (1964); Thogmartin v. United States, 313 F.2d 589, 590 (8 Cir., 1963); Koop v. United States, 296 F.2d 53 (8 Cir., 1961); Blauner v. United States, 293 F.2d 723, 725 (8 Cir., 1961), cert. den. 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 193; Cf. Taylor v. State of Mississippi, 319 U.S. 583, 585–586 (1943), 63 S.Ct. 1200, 87 L.Ed. 1600.

The undisputed evidence as summarized herein establishes the relationship of the three defendants and their actions toward effecting the object of the conspiracy. Cave and Sirkin (Karl) renewed acqaintances shortly after Sirkin arrived in Des Moines. Cave was associated with the events that followed. He assisted in effectuating the conspiracy. Even so, only a few days thereafter, he denied that he knew the defendant Amsterdam.

Is is well established that the gist of the offense of conspiracy is agreement among conspirators to commit an offense attended by an act of one or more of the conspirators to effect the object of the conspiracy. It is quite true, as urged by the defendants and as held in United States v. Falcone, 311 U.S. 205, 210, 61 S.Ct. 204, 207, 85 L.Ed. 128, that "Those having no knowledge of the conspiracy are not conspirators." Such rule is of no aid to the defendants in this case as there is substantial evidence to establish that each was a member and participant in the conspiracy.

Of course, not all of the evidence is direct; much of it is circumstantial. But, "participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstance'". Thogmartin v. United States, supra; Isaacs v. United States, 301 F.2d 706, 725 (8 Cir., 1962), cert. den. 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58; Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680; where it is established that a conspiracy has been formed, "but slight evidence connecting a defendant therewith may still be substantial, and if so, sufficient". Isaacs v. United States, supra; Galatas v. United States, 8 Cir., 80 F.2d 15, 24, cert. den. 297 U.S. 711, 56 S.Ct. 574, 80 L.Ed. 998; McDonald v. United States, 8 Cir., 89 F.2d 128, 138, 139, cert. den. 301 U.S. 697, 57 S.Ct. 925, 81 L.Ed. 1352; Marx v. United States, 8 Cir., 86 F.2d 245, 250.

This court stated the rule succinctly in Phelps v. United States, 160 F.2d 858, 867, as follows:

"Once there is satisfactory proof that a conspiracy has been formed, the question of a particular defendant's connection with it may be merely a matter of whether the stick fits so naturally into position in the fagot as to convince that it is part of it." It is therefore possible for the circumstances on an individual defendant's participation in an established conspiracy to become substantial from their weight in position and context, though in abstraction they may seem only slight. Cf. Isaacs v. United States, 301 F.2d 706, 725.

■ There was substantial evidence to support the action of the jury in returning a verdict of guilty against each of the defendants.

The other contention of defendant Cave is:

THE COURT ERRED IN ADMITTING TESTIMONY AND EXHIBITS THAT WERE HEARSAY, INCOMPETENT, IRRELEVANT, AND IMMATERIAL AS TO HIM.

Defendants Sirkin and Amsterdam embraced this contention in the record, but did not include it in their brief.

■ The argument here is that the admission of the testimony of various conversations by one or more of the conspirators not made in the presence of defendant Cave, and principally the telephone calls to the various businesses arranging for the merchandise which was outside of his presence, was hearsay, irrelevant, immaterial and improper, and, therefore, prejudicial. It is strongly contended by Cave that he had no knowledge of the prior wrongdoings of Amterdam and Sirkin.

"A defendant can join a conspiracy at any time and may be found to have done so when, with knowledge of its existence, he has undertaken to further its design. Thomas v. United States,

8 Cir., 156 F. 897, 912, 84 C.C.A. 477, 17 L.R.A.,N.S., 720; Allen v. United States, 7 Cir., 4 F.2d 688, 691; Parnell v. United States, 10 Cir., 64 F.2d 324, 327."

■ The well recognized rule that there must be proof aliunde before the acts and declarations of an alleged conspirator not made in the presence of a defendant may be admitted, does not serve here to render the testimony timely challenged inadmissible. Thogmartin v. United States, supra; Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 467, 86 L.Ed. 680; Minner v. United States, 10 Cir. 1943, 57 F.2d 506, 511; Beatrice Foods Company v. United States, 312 F.2d 29, 41, 46. With proof aliunde in this record the testimony was properly admitted.

■ In view of the foregoing conclusions as to the conspiracy count it is unnecessary for us to consider the evidence as to the second count charging interstate transportation of the merchandise obtained by fraud. If the defendants were properly convicted upon either count of the indictment, then in as much as the sentences on each count is the same and is not more than the maximum allowable, the judgments must be affirmed. Thogmartin v. United States, supra, Wood v. United States, 8 Cir., 1960, 279 F.2d 359, 360; Bowen v. United States, 8 Cir., 1946, 153 F.2d 747, 751, cert. den. 328 U.S. 835, 66 S.Ct. 980, 90 L.Ed. 1611; Gantz v. United States, 8 Cir., 1942, 127 F.2d 498, 501, cert. den. 317 U.S. 625, 63 S.Ct. 47, 87 L.Ed. 505.

This somewhat lengthy and vigorously contested case presented a number of difficult questions for the presiding judge. The contentions of error are without merit. We are convinced that there was no prejudice to the appellants through any of the trial court's rulings, that the cases were tried with great care by Judge Stephenson, and that the appellants had a fair trial.

Judgments affirmed.